# NATIONAL LABOR RELATIONS BOARD *v.* INTERNATIONAL LONGSHOREMEN'S ASSN., AFL–CIO, ET AL.

No. 79–1082.  Argued April 22, 1980—Decided June 20, 1980

Marshall, J., delivered the opinion of the Court, in which Brennan, White, Blackmun, and Powell, JJ., joined. Burger, C. J., filed a dissenting opinion, in which Stewart, Rehnquist, and Stevens, JJ., joined, *post*, p. 522.

*Deputy Solicitor General Wallace* argued the cause for petitioner. With him on the briefs were *Solicitor General McCree, Stephen M. Shapiro, Robert E. Allen, Norton J. Come, Linda Sher,* and *Howard E. Perlstein.* *J. Alan Lips* argued the cause for Tidewater Motor Truck Association, respondent under this Court's Rule 21 (4), in support of petitioner. With him on the briefs was *Marshall T. Bohannon, Jr.*

*Thomas W. Gleason* argued the cause for respondent International Longshoremen's Association, AFL–CIO. With him on the brief were *Ernest L. Mathews, Jr.,* and *Andre Mazzola Mardon.* *Constantine P. Lambos* argued the cause for respondents New York Shipping Association, Inc., et al. With him on the brief were *Francis A. Scanlan, Alfred A. Giardino,* and *Donato Caruso.* *Carl W. Schwarz* and *Stephen P. Murphy* filed a brief for respondent Dolphin Forwarding, Inc. *Whiteford S. Blakeney* and *William L. Auten* filed a brief for respondent Houff Transfer, Inc.*

---

*Briefs of *amici curiae* urging reversal were filed by *Kenneth C. McGuiness, Robert E. Williams,* and *Daniel R. Levinson* for the Air Condi-

Mr. Justice Marshall delivered the opinion of the Court.

This case presents the question whether provisions of the collective-bargaining agreement between the International Longshoremen's Association (ILA) and employer organizations in the shipping industry which were adopted in response to the technological innovation of containerized shipping are a lawful work preservation agreement. The National Labor Relations Board held that the provisions did not preserve traditional work opportunities for employees represented by the union, but sought instead to acquire work they had not previously performed; therefore, it concluded that the provisions violated § 8 (e) of the National Labor Relations Act, 29 U. S. C. § 158 (e), and union action to enforce them violated § 8 (b)(4)(B) of the Act, 29 U. S. C. § 158 (b)(4)(B). *International Longshoremen's Assn. (Dolphin Forwarding, Inc.)*, 236 N. L. R. B. 525 (1978); *International Longshoremen's Assn. (Associated Transport, Inc.)*, 231 N. L. R. B. 351 (1977). A divided panel of the United States Court of Appeals for the District of Columbia Circuit declined to enforce the Board's orders. 198 U. S. App. D. C. 157, 613 F. 2d 890 (1979). We granted certiorari, 444 U. S. 1042 (1980), to resolve a conflict among the Circuits on this important question of federal labor law.[1]

## I

This controversy arises out of the collective-bargaining response of the ILA and the east coast shipping industry to

tioning & Refrigeration Institute et al.; by *Nelson J. Conney, Kenneth E. Siegel, Robert A. Hirsch,* and *Alan J. Thiemann* for the American Trucking Associations, Inc.; and by *Raymond P. de Member* for the International Association of NVOCCS.

[1] A contrary result was reached in *International Longshoremen's Assn., Local 1575 v. NLRB,* 560 F. 2d 439 (CA1 1977), and in *International Longshoremen's Assn. v. NLRB,* 537 F. 2d 706 (CA2 1976), cert. denied, 429 U. S. 1041 (1977). Cf. *Humphrey v. International Longshoremen's Assn.,* 548 F. 2d 494 (CA4 1977).

containerization, a technological innovation which has had such a profound effect on that industry that it has frequently been termed "the container revolution."[2] In the words of one observer, "containerization may be said to constitute the single most important innovation in ocean transport since the steamship displaced the schooner."[3]

## A

Containers are large, reusable metal receptacles, ranging in length from 20 to 40 feet and capable of carrying upwards of 30,000 pounds of freight, which can be moved on and off an ocean vessel unopened. Container ships are specially designed and constructed to carry the containers, which are affixed to the hold. A container can also be attached to a truck chassis and transported intact to and from the pier like a conventional trailer.

The use of containers is substantially more economical than traditional methods of handling ocean-borne cargo.[4] Because cargo does not have to be handled and repacked as it moves from the warehouse by truck to the dock, into the vessel, then from the vessel to the dock and by truck or rail to its destination, the costs of handling are significantly reduced. Expenses of separate export packaging, storage, losses from pilferage and breakage, and costs of insurance and processing cargo documents may also be decreased. Perhaps most sig-

---

[2] See, e. g., Ullman, The Role of the American Ocean Freight Forwarder in Intermodal, Containerized Transportation, 2 J. Mar. L. & Comm. 625, 627 (1971); Schmeltzer & Peavy, Prospects and Problems of the Container Revolution, 1 J. Mar. L. & Comm. 203 (1970); Note, Containerization and Intermodal Service in Ocean Shipping, 21 Stan. L. Rev. 1077, 1078 (1969).

[3] Ross, Waterfront Labor Response to Technological Change: A Tale of Two Unions, 21 Lab. L. J. 397, 398 (1970).

[4] See Ross, supra n. 3, at 399–400; Schmeltzer & Peavy, supra n. 2, at 206–210; Note, supra n. 2, at 1087–1092.

nificantly, a container ship can be loaded or unloaded in a fraction of the time required for a conventional ship.[5]   As a result, the unprofitable in-port time of each ship is reduced, and a smaller number of ships are needed to carry a given volume of cargo.[6]

Before the introduction of container ships, and as is still the case with conventional vessels, trucks delivered loose, or break-bulk, cargo to the head of the pier.   The cargo was then transferred piece by piece from the truck's tailgate to the ship by longshoremen employed by steamship or stevedoring companies.   The longshoremen checked the cargo, sorted it, placed it on pallets and moved it by forklift to the side of the ship, and lifted it by means of a sling or hook into the ship's hold.[7]   The process was reversed for cargo taken off incoming ships.   With the advent of containers, the amount of on-pier work involved in cargo handling has been drastically reduced, since the cargo need not be loaded and unloaded piece by piece.   The amount of work available for longshoremen has been further reduced by the shipping companies' practice of making their containers available to ship-

---

[5] See Ross, *supra* n. 3, at 399 (36-48 hours, compared to 7 or 8 days for conventional vessel) ; Schmeltzer & Peavy, *supra* n. 2, at 208 (8 hours compared to 3 days).

[6] See Note, *supra* n. 2, at 1088 (container ship spends 25% of its time in port, compared to 60% for conventional vessel).

[7] The longshore unit in the Port of New York was certified by the National Labor Relations Board as

"[a]ll longshore employees engaged in work pertaining to the rigging of ships, coaling of same, loading and unloading of cargoes, including mail, ships' stores and baggage, handling lines in connection with the docking and undocking of ships, including hatch bosses; cargo repairmen, checkers, clerks and timekeepers and their assistants, including head receiving and delivery clerks; general maintenance, mechanical and miscellaneous workers; horse and cattle fitters, grain ceilers, and marine carpenters, in the Port of Greater New York and vicinity. . . ." *New York Shipping Assn.*, 116 N. L. R. B. 1183, 1188 (1956) (footnote omitted).

pers and consolidators [8] for loading and unloading away from the pier.

Containerization, then, was a technological advance of great importance to the shipping industry which at the same time threatened the jobs of longshoremen by dramatically increasing their productivity.[9] As one might expect, the subject has been a hotly disputed topic of collective bargaining between the union and the employers.[10] We are concerned with the results of that collective-bargaining process as it affects the shipping industry in the Ports of New York, Baltimore, and Hampton Roads, Va.

### B

It is necessary, in discussing the collective-bargaining agreements here at issue, to define certain industry terms of art

---

[8] A freight consolidator combines the goods of various shippers into a single shipment at its own off-pier terminal and delivers the shipment to the pier. Ordinarily, consolidators operate no transportation of their own except for pickup and delivery equipment. They contract with carriers, such as truckers and steamship lines, for the actual transportation of the goods. See Comment, Intermodal Transportation and the Freight Forwarder, 76 Yale L. J. 1360, 1362 (1967). A consolidator who acts as a carrier by arranging for the transportation of goods from port to port is called a nonvessel operating common carrier by water (NVOCC), and is regulated by the Federal Maritime Commission. See Federal Maritime Commission, Preliminary Staff Report on Non-Vessel Operating Common Carriers by Water (Dec. 8, 1970); see generally Ullman, *supra* n. 2.

[9] See, *e. g.*, 198 U. S. App. D. C., at 159, 613 F. 2d, at 892; Ross, *supra* n. 3, at 400.

[10] The longshoremen involved in this dispute are represented by the ILA. Their employers, shipowners and stevedoring companies operating in the Ports of New York, Baltimore, and Hampton Roads, belong to several employers' organizations. These include the New York Shipping Association (NYSA), the Steamship Trade Association of Baltimore (STAB), and the Hampton Roads Shipping Association (HRSA). Since 1970, the Council of North Atlantic Shipping Associations (CONASA), a multiemployer bargaining association representing shipping associations including NYSA, STAB, and HRSA, has bargained with ILA on a master-contract basis.

pertaining to containerized cargo. Loading cargo into a container is called "stuffing"; unloading cargo from a container is called "stripping." Containers holding goods beneficially owned by one shipper or consignee are called full shippers' loads (FSL). Containers holding goods belonging to more than one shipper or consignee are called consolidated container loads. Such cargo is also called "less than trailer load" (LTL) or "less than container load" (LCL) cargo.

The first collective-bargaining agreement to contain a provision dealing with containerized shipping was the 1959 agreement between ILA and the New York Shipping Association (NYSA). At that time, containerization was in its infancy.[11] The provision in the 1959 agreement was prompted by a dispute over the use of Dravo containers, boxes eight cubic feet in size. See *International Longshoremen's Assn. (Consolidated Express, Inc.)*, 221 N. L. R. B. 956, 957 (1975), enf'd, 537 F. 2d 706 (CA2 1976), cert. denied, 429 U. S. 1041 (1977). The agreement recognized the right of NYSA members "to use any and all type [*sic*] of containers without restriction or stripping by the union." 221 N. L. R. B., at 957. In return, NYSA agreed to contribute royalty payments on "containers which are loaded or unloaded away from the pier by non-ILA labor." *Ibid.* The agreement also provided:

> "Any work performed in connection with the loading and discharging of containers for employer members of NYSA which is performed in the Port of Greater New York whether on piers or terminals controlled by them,

---

[11] The first specially fitted container ship began operating in the late 1950's between New York and Puerto Rico. See App. 117. As late as 1966, the percentage of general cargo moved by containers in the Port of New York was only 3%. See Ross, *supra* n. 3, at 398. The first container ships did not appear in the Ports of Baltimore and Hampton Roads until 1965 and 1966. See 198 U. S. App. D. C., at 161, 613 F. 2d, at 894; *International Longshoremen's Assn. (Associated Transport, Inc.)*, 231 N. L. R. B. 351, 359 (1977).

or whether through direct contracting out, shall be performed by ILA labor at longshore rates." *Ibid.*

After the 1959 agreement was reached, the development of container shipping accelerated. In 1967, ILA demanded in collective-bargaining negotiations that longshoremen stuff and strip all containers crossing the piers. Following a lengthy strike, ILA and NYSA in 1969 adopted, as part of their 1968–1971 collective-bargaining agreement, the Rules on Containers (Rules). The terms of that master agreement were adopted by other ports on the North Atlantic coast, including Hampton Roads and Baltimore. The Rules were slightly modified in 1971, after another long strike. In 1973 ILA and the Council of North Atlantic Shipping Associations (CONASA) executed the "Dublin Supplement" as an "interpretive bulletin" to the Rules. The substance of the Dublin Supplement was incorporated in the version of the Rules contained in the 1974–1977 collective-bargaining agreement.[12]

In essence, the Rules contained in the 1968 and 1971 agreements provided that if containers owned or leased by the shipping companies and carrying LTL or consolidated container loads were to be stuffed or stripped within the local port area (that is, within a geographical radius of 50 miles of the port) by anyone other than the employees of the beneficial owner of the cargo, that work must be done at the piers by ILA labor. The shipping companies were required to pay a royalty on containers that passed over the piers intact, as well as liquidated damages, presently set at $1,000 per container, for any container handled in violation of the Rules. The Dublin Supplement declared that the Rules applied to all containers, including those designated as FSL containers, which were stuffed or stripped in the local area by other than the beneficial owner's own employees. The Supplement also noted an exception for FSL containers warehoused locally for at least 30 days, and, as a method of enforcing the Rules,

---

[12] The 1974 Rules are reproduced in the appendix to this opinion.

prohibited the employers from releasing any of their containers to known consolidators with facilities located within 50 miles of the port.

Thus, under the final version of the Rules incorporated in the 1974 agreement, if containers owned or leased[13] by the shipping companies are to be stuffed or stripped locally by anyone other than the employees of the beneficial owner of the cargo, that work must be done at the piers by ILA labor. FSL containers that are transported intact to or from the beneficial owner or that are warehoused locally for 30 days, and consolidated containers coming from or bound for points outside the local area, do not have to be stuffed and stripped by ILA members. The practical effect of the Rules is that some 80% of containers pass over the piers intact. App. 612. The remaining 20% are stuffed and stripped by longshoremen, regardless of whether that work duplicates work done by non-ILA employees off-pier.

## C

This case involves two proceedings before the National Labor Relations Board (Board) on charges that the Rules are illegal secondary activity in violation of federal labor law. The cases were consolidated on appeal. The *Dolphin* proceeding, 236 N. L. R. B. 525 (1978), concerns the application

---

[13] The 1968 and 1971 versions of the Rules referred only to containers "owned or leased" by the employers, see App. 237, 238, 247, 272, 273. The 1974 agreement refers to containers "owned, leased or used by carriers." See *infra,* at 514. There is nothing in the record to indicate that the fines which led to the unfair labor practice charges before us were imposed for infractions relating to containers which were not owned or leased by CONASA members. Therefore we, like the Board and the Court of Appeals, assume that the Rules have application only to containers that belong to the contracting employers. See 198 U. S. App. D. C., at 179, 613 F. 2d, at 912; 236 N. L. R. B., at 526; 231 N. L. R. B., at 359; *International Longshoremen's Assn. (Consolidated Express, Inc.),* 221 N. L. R. B. 956, 958, 959 (1975); but see 231 N. L. R. B., at 353, n. 3 (Fanning, Chairman, dissenting).

of the provisions on LCL cargo to containers used by consolidators operating within 50 miles of the Port of New York. The *Associated Transport* proceeding, 231 N. L. R. B. 351 (1977), concerns the application of the Rules to FSL containers whose cargo was transferred by truckers to their own trucks within 50 miles of the Ports of Baltimore and Hampton Roads. The affected truckers and consolidators filed unfair labor practice charges with the Board, alleging that the Rules constituted a "hot cargo" agreement in violation of § 8 (e) of the National Labor Relations Act (Act) and that the activities of the parties to the agreement in enforcing its terms were an illegal secondary boycott prohibited by § 8 (b)(4)(B) of the Act.

The facts underlying the charges may be briefly stated. Dolphin Forwarding, Inc. (Dolphin), and San Juan Freight Forwarding, Inc. (San Juan), were NVOCC consolidators, see n. 8, *supra,* soliciting business from shippers throughout the United States who wished to transport LCL cargo between New York and Puerto Rico.[14] Dolphin and San Juan received their customers' goods at their off-pier facilities, located within 50 miles of the Port of New York. Using subcontracted non-ILA labor, they consolidated the goods of two or more shippers, stuffed them into containers provided by members of NYSA, and had the filled containers trucked to the pier to be loaded onto ships by longshoremen.[15] As a result of these practices, the NYSA members who had supplied their containers to the consolidators were assessed liquidated damages of approximately $47,000. Those carriers then

[14] Dolphin has since ceased doing business in New York.

[15] Dolphin began such operations several years before the adoption of the Rules. The NYSA members contended that they supplied containers to Dolphin only because it listed Massachusetts as the point of origin for the containers rather than the actual facility within the port area. San Juan was established in 1972, several years after the Rules were first adopted. It apparently listed Chicago as the point of origin of containers it shipped. 198 U. S. App. D. C., at 166, 613 F. 2d, at 899.

informed Dolphin and San Juan that they would no longer furnish them with containers. Thereupon, Dolphin and San Juan filed unfair labor practice charges with the Board.

Houff Transport, Inc. (Houff), and Associated Transport, Inc. (Associated),[16] were Interstate Commerce Commission-licensed common carriers who operated motor freight terminals within 50 miles of the Ports of Baltimore and Hampton Roads. Since the advent of containerization, they had transported FSL container loads to consignees both within and beyond the 50-mile radius, and routinely stripped such FSL containers and restuffed the cargo into their own vehicles for reasons of economy, safety, or state highway or bridge regulations.

The practice of using non-ILA labor to strip and restuff FSL cargo within the 50-mile radius is known as shortstopping. Although the Rules, prior to the Dublin Supplement, did not expressly discuss FSL cargo, see App. 235–250, 270–276, the ILA and the shipping companies apparently regarded shortstopping as an infraction, see 198 U. S. App. D. C., at 162, 613 F. 2d, at 895; 231 N. L. R. B., at 355 (Fanning, Chairman, dissenting). The Dublin Supplement, and subsequent versions of the Rules, provided that ILA labor must handle all FSL containers that otherwise would be handled within the local area by other than the consignee's own employees, except for FSL cargo consigned to the beneficial owner's place of business or warehoused for 30 days within the port area.

After the new Rules became effective, Houff and Associated shortstopped containers picked up from CONASA members. The shipping companies were assessed liquidated damages for each such container. When Houff and Associated refused to indemnify them for the fines, the shipping companies canceled their interchange agreements. Houff, Associated, and the Tidewater Motor Truck Association (TMTA), an asso-

---

[16] Associated is no longer in business.

ciation of which Associated was a member, filed unfair labor practice charges.

In holding that the charges were substantiated in both the *Dolphin* and *Associated Transport* proceedings, the Board relied on its previous decision in *International Longshoremen's Assn. (Consolidated Express, Inc.)*, 221 N. L. R. B. 956 (1975), enf'd, 537 F. 2d 706 (CA2 1976), cert. denied, 429 U. S. 1041 (1977) (hereinafter *Conex*).[17] In *Conex*, the Board held that the traditional work of longshoremen has been to load and unload ships at the pier. As the Board explained in the *Dolphin* proceeding, *Conex*

> "held that the Rules were not valid work-preservation clauses in that traditionally the off-pier stuffing and stripping of containers was performed by consolidating companies and not longshoremen. Since the work was not traditional longshore work and had never been performed by longshoremen, the Rules which required the shipping companies to stop doing business with consolidators did not have a lawful work-preservation object." 236 N. L. R. B., at 526.

Similarly, in the *Associated Transport* proceeding the Board affirmed the finding by the Administrative Law Judge (ALJ) of an unfair labor practice because longshoremen "had *not* historically done the work" of stripping FSL containers away from the pier. 231 N. L. R. B., at 353 (emphasis in original).

---

[17] The Rules were first litigated in 1970 when the United States Court of Appeals for the Second Circuit rejected a claim that their enforcement violated the antitrust laws. The Court of Appeals held that the Rules came under the labor exemption. *Intercontinental Container Transport Corp.* v. *New York Shipping Assn.*, 426 F. 2d 884 (1970). The plaintiff in the antitrust proceeding also initiated related unfair labor practice proceedings before the Board by filing unfair labor practice charges alleging violations of §§ 8 (e) and 8 (b)(4)(B). The Regional Director's dismissal of the charges, on the ground that the Rules were a valid work preservation agreement, was affirmed on appeal by the Board's General Counsel. App. 621.

In short, in the Board's view the Rules sought to acquire for ILA members work that had historically been performed not by longshoremen but by employees of consolidators and truckers. Therefore the Rules had a secondary objective forbidden by the Act.

ILA and CONASA appealed to the Court of Appeals, and the Board cross-applied for enforcement of its orders.[18] The cases were consolidated. A divided panel of the Court of Appeals refused enforcement, holding that the Board had erred as a matter of law in defining the work in controversy. It therefore vacated the Board's decisions, denied its applications for enforcement, and remanded the cases for further proceedings. We affirm.

## II

Section 8 (b)(4)(B) of the Act[19] prohibits unions and their agents from engaging in secondary activities whose object is to force one employer to cease doing business with another. Section 8 (e)[20] makes unlawful those collective-

---

[18] Houff intervened on appeal, and TMTA and Dolphin were permitted to intervene after the Court of Appeals issued its decision.

[19] Section 8 (b), as set forth in 29 U. S. C. § 158 (b), provides in pertinent part:

"It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

"(4) (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is—

. . . . .

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful . . . any primary strike or primary picketing. . . ."

[20] Section 8 (e), as set forth in 29 U. S. C. § 158 (e), provides in pertinent part:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied,

bargaining agreements in which the employer agrees to cease doing business with any other person. Although § 8 (e) does not in terms distinguish between primary and secondary activity, we have held that, as in § 8 (b)(4)(B), Congress intended to reach only agreements with secondary objectives. See *NLRB* v. *Pipefitters,* 429 U. S. 507, 517 (1977) (hereinafter *Pipefitters*); *National Woodwork Manufacturers Assn.* v. *NLRB,* 386 U. S. 612, 620, 635 (1967) (hereinafter *National Woodwork*).

Among the primary purposes protected by the Act is "the purpose of preserving for the contracting employees themselves work traditionally done by them." *Pipefitters, supra,* at 517. Whether an agreement is a lawful work preservation agreement depends on "whether, under all the surrounding circumstances, the Union's objective was preservation of work for [bargaining unit] employees, or whether the [agreement was] tactically calculated to satisfy union objectives elsewhere. . . . The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-à-vis* his own employees." *National Woodwork, supra,* at 644–645 (footnotes omitted). Under this approach, a lawful work preservation agreement must pass two tests: First, it must have as its objective the preservation of work traditionally performed by employees represented by the union. Second, the contracting employer must have the power to give the employees the work in question—the so-called "right of control" test of *Pipefitters, supra.* The rationale of the second test is that if the contracting employer has no power to assign the work, it is reasonable to infer that the agreement has a secondary objec-

whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void. . . ."

tive, that is, to influence whoever does have such power over the work. "Were the latter the case, [the contracting employer] would be a neutral bystander, and the agreement or boycott would, within the intent of Congress, become secondary." *National Woodwork, supra,* at 644–645.

In applying the work preservation doctrine, the first and most basic question is: What is the "work" that the agreement allegedly seeks to preserve? Sometimes the process of identifying the work at issue will require no subtle analysis. In *National Woodwork,* for example, the agreement preserved for the carpenters employed by a general contractor the work of fitting all doors installed on the jobsite. This was work they had always done, and the method the parties chose to preserve the carpenters' right to that work was simply to prohibit the employer from purchasing any doors that had been prefitted by any other employees. That the provision incidentally required the employer to boycott all prefitted doors was of no consequence to the validity of the agreement. See *Pipefitters, supra,* at 510, 526.

But in many cases it is not so easy to find the starting point of the analysis. Work preservation agreements typically come into being when employees' traditional work is displaced, or threatened with displacement, by technological innovation. The national labor policy expresses a preference for addressing "the threats to workers posed by increased technology and automation" by means of "labor-management agreements to ease these effects through collective bargaining on this most vital problem created by advanced technology." *National Woodwork, supra,* at 641, 642. In many instances, technological innovation may change the method of doing the work, instead of merely shifting the same work to a different location. One way to preserve the work of the employees represented by the union in the face of such a change is simply to insist that the innovation not be adopted and that the work continue to be done in the traditional way.

The union in *National Woodwork* followed this tactic and negotiated an agreement in which the employer agreed not to use prefabricated materials. We held that agreement was lawful under §§ 8 (e) and 8 (b)(4)(B). But the protection Congress afforded to work preservation agreements cannot be limited solely to employees who respond to change with intransigence. Congress, in enacting § 8 (e), did not intend to protect only certain kinds of work preservation agreements; rather, it "had no thought of prohibiting agreements directed to work preservation," *National Woodwork, supra,* at 640. The work preservation doctrine, then, must also apply to situations where unions attempt to accommodate change while preserving as much of their traditional work patterns as possible.[21] When this is the case the inquiry must be more refined and the analysis more discriminating.

The Board held that " '[t]he traditional work of the longshoremen represented by ILA has been to load and unload ships. When necessary to perform their loading and unloading work, longshoremen have been required to stuff and strip containers on the piers.' " 231 N. L. R. B., at 364 (decision of ALJ, adopted by the Board), quoting *Conex,* 221 N. L. R. B., at 959; see 236 N. L. R. B., at 526. The Board then determined that the work in controversy was "the off-pier stuffing and stripping of containers," *ibid.;* see 231 N. L. R. B., at 364–365. Similarly, in *Conex* the Board stated: "It is clear from the record that the work in controversy here is the LCL and LTL container work performed by [the charging parties] at their own off-pier premises." 221 N. L. R. B., at 959. Because ILA members had never performed such work, the Board concluded that the Rules were an illegal attempt to reach out and acquire work that was not within the union's traditional work jurisdiction and which its members had never performed. We agree with the Court of Appeals that this

---

[21] See Comment, Work Recapture Agreements and Secondary Boycotts: *ILA* v. *NLRB* (*Consolidated Express, Inc.*), 90 Harv. L. Rev. 815 (1977).

approach to defining the work at issue was incorrect as a matter of law.

The Board's approach reflects a fundamental misconception of the work preservation doctrine as it has been applied in our previous cases. Identification of the work at issue in a complex case of technological displacement requires a careful analysis of the traditional work patterns that the parties are allegedly seeking to preserve, and of how the agreement seeks to accomplish that result under the changed circumstances created by the technological advance. The analysis must take into account "all the surrounding circumstances," *National Woodwork*, 386 U. S., at 644, including the nature of the work both before and after the innovation. In a relatively simple case, such as *National Woodwork* or *Pipefitters*, the inquiry may be of rather limited scope. Other, more complex cases will require a broader view, taking into account the transformation of several interrelated industries or types of work; this is such a case. Whatever its scope, however, the inquiry must be carefully focused: to determine whether an agreement seeks no more than to preserve the work of bargaining unit members, the Board must focus on the work of the bargaining unit employees, not on the work of other employees who may be doing the same or similar work,[22] and examine the relationship between the work as it existed before the innovation and as the agreement proposes to preserve it.

The Board, by contrast, focused on the work done by the employees of the charging parties, the truckers and consolidators, after the introduction of containerized shipping. It found that work was similar to work those employees had done before the innovation, and concluded that ILA was

---

[22] The effect of work preservation agreements on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant to the validity of the agreement so long as the union had no forbidden secondary purpose to affect the employment relations of the neutral employer. See *Pipefitters*, 429 U. S., at 510, 526.

trying to acquire the traditional work of those employees. That conclusion ignores the fact that the impact of containerization occurred at the interface between ocean and motor transport; not surprisingly, the work of stuffing and stripping containers is similar to work previously done by both longshoremen and truckers. The Board's approach would have been entirely appropriate in considering an agreement to preserve the work of truckers' employees, but it misses the point when applied to judge this contract between the ILA and the shipowner employers.

By focusing on the work as performed, after the innovation took place, by the employees who allegedly have displaced the longshoremen's work, the Board foreclosed—by definition—any possibility that the longshoremen could negotiate an agreement to permit them to continue to play any part in the loading or unloading of containerized cargo. For the very reason the Rules were negotiated was that longshoremen do not perform that work away from the pier, and never have. Thus it is apparent that under the Board's approach, in the words of the Court of Appeals, the "work preservation doctrine is sapped of all life." 198 U. S. App. D. C., at 176, 613 F. 2d, at 909.

That this is so is vividly demonstrated by considering how different would have been the results in *National Woodwork* and *Pipefitters* if we had adopted the approach now chosen by the Board. In *National Woodwork* we held that carpenters could seek to preserve their traditional work of finishing blank doors at the construction jobsite by prohibiting the employer, a general contractor, from purchasing prefinished doors from the factory. If we had followed the Board's current approach in analyzing the agreement, we would have defined the work in controversy as "the finishing of blank doors away from the construction site." That work, of course, had never been done by the carpenters employed by the general contractor, but had been performed by the employees of

the door manufacturers since before the adoption of the agreement. We would perforce have determined that the object of the agreement was work acquisition, not work preservation.

Similarly, *Pipefitters* involved an agreement between a subcontractor and a pipefitters' union that pipe threading and cutting were to be performed on the jobsite. Relying on the agreement, the union refused to install climate-control units whose internal piping had been cut, threaded, and installed at the factory. The Board held that the provision was a lawful work preservation agreement, but that the refusal to handle the prepiped units was an unfair labor practice because the units had been specified by the general contractor and the subcontractor had no power to assign the employees the work they sought. Neither the Court of Appeals nor this Court questioned the validity of the work preservation clause but for the fact that it was enforced against an employer who could not control the work. Under the Board's current approach, however, the "work" would have been "cutting, threading, and installing pipe in climate-control units at the factory." Since the bargaining unit employees had never performed that work, there would have been no reason to reach the "right of control" issue.

Thus the Board's determination that the work of longshoremen has historically been the loading and unloading of ships should be only the beginning of the analysis. The next step is to look at how the contracting parties sought to preserve that work, to the extent possible, in the face of a massive technological change that largely eliminated the need for cargo handling at intermediate stages of the intermodal transportation of goods, and to evaluate the relationship between traditional longshore work and the work which the Rules attempt to assign to ILA members.[23] This case pre-

---

[23] We need hardly add that the analysis is not, as the parties have sometimes seemed to suggest, simply a matter of deciding whether a con-

sents a much more difficult problem than either *National Woodwork* or *Pipefitters* because the union did not simply insist on doing the work as it had always been done and try to prevent the employers from using container ships at all—though such an approach would have been consistent with *National Woodwork* and *Pipefitters*. Instead, ILA permitted the great majority of containers to pass over the piers intact, reserving the right to stuff and strip only those containers that would otherwise have been stuffed or stripped locally by anyone except the beneficial owner's employees. The legality of the agreement turns, as an initial matter, on whether the historical and functional relationship between this retained work and traditional longshore work can support the conclusion that the objective of the agreement was work preservation rather than the satisfaction of union goals elsewhere.[24]

Respondents assert that the stuffing and stripping reserved for the ILA by the Rules is functionally equivalent to their former work of handling break-bulk cargo at the pier.[25] Petitioners-intervenors, on the other hand, argue that containerization has worked such fundamental changes in the industry that the work formerly done at the pier by both longshore-

---

tainer is more like the hold of a ship or more like a big box. The usefulness of a container lies precisely in the fact that it may function as an integral part of the hold while it is aboard a vessel, as a trailer when it is transported by truck, and as part of a railroad car when it is carried by rail.

[24] Obviously, the result will depend on how closely the parties have tailored their agreement to the objective of preserving the essence of the. traditional work patterns. Thus the claim that if the Rules are upheld the union would be able to follow containers around the country and assert the right to stuff and strip them far inland is groundless. That work would bear an entirely different relation to traditional longshore work, and would require a wholly different analysis.

[25] They contend that there is no significant economic advantage to be gained from containerization over break-bulk handling at the pier when the stuffing and stripping is to be done locally.

men and employees of motor carriers has been completely eliminated.

These questions are not appropriate for initial consideration by reviewing courts. They are properly raised before the Board, whose determinations are, of course, entitled to deference. Since the Board has not had an opportunity to consider these questions in relation to a proper understanding of the work at issue, we will not address them here. We emphasize that neither our decision nor that of the Court of Appeals implies that the result of the Board's reconsideration of this case is foreordained.[26] Viewing the work allegedly to be preserved by the Rules from the proper perspective, the Board will be free to determine whether the Rules represent a lawful attempt to preserve traditional longshore work, or whether, instead, they are "tactically calculated to satisfy union objectives elsewhere," *National Woodwork,* 386 U. S., at 644. This determination will, of course, be informed by an awareness of the congressional preference for collective bargaining as the method for resolving disputes over dislocations caused by the introduction of technological innovations in the workplace, see *id.,* at 641–642. Thus, in judging the legality of a thoroughly bargained and apparently reasonable accommodation to technological change, the question is not whether the Rules represent the most rational or efficient response to innovation, but whether they are a legally permissible effort to preserve jobs.

If the Board finds, on remand, that the Rules have a lawful work preservation objective, it will then, of course, be obliged

---

[26] The dissenting opinion of THE CHIEF JUSTICE proceeds on the assumption that we decide today the proper definition of the work in controversy, see *post,* at 528, and hold that the Rules are a lawful work preservation agreement, see *post,* at 525, 528–529. Our holding, we repeat, is that the Board's definition of the work in controversy was erroneous as a matter of law. The question whether the Rules may be sustained under a proper understanding of the work preservation doctrine must be answered first by the Board on remand.

to consider the charging parties' contention that CONASA members did not have the right to control the stuffing and stripping of containers. Because the Board held that the agreement was directed at work acquisition, rather than work preservation, it did not decide the right-to-control issue in this case. That issue remains open on remand. Therefore, and because the arguments of the parties were necessarily addressed to an erroneous conception of the work whose control was disputed,[27] any discussion of that issue here would be premature. Respondents have also argued that the employers, as common carriers who are subject to Government regulation and to the provisions of their own tariffs, shippers' bills of lading, and intermodal interchange agreements with motor carriers, have no legal right to withhold containers or container services from their customers on a selective basis, to condition access to the containers on compliance with the Rules, to seek indemnification from their customers for fines imposed under the Rules, or to enforce the Rules after the containers have been released to motor carriers. See, *e. g.,* Shipping Act, 1916, 46 U. S. C. § 801 *et seq.;* Intercoastal Shipping Act, 1933, 46 U. S. C. § 843 *et seq.; Sea-Land Service, Inc.—Proposed ILA Rules on Containers,* 20 F. M. C. 788 (1978), review pending, No. 78–1776 (CADC). These contentions present difficult and complex problems which are not properly before us.

We conclude that the Court of Appeals correctly held that the Board's definition of the work in controversy in this dispute was erroneous as a matter of law, and we therefore affirm the Court of Appeals' judgment vacating the Board's decisions,

---

[27] It is plain that the outcome of the right-to-control test will be significantly affected by whether the work in controversy is viewed as the stuffing and stripping done at the off-pier facilities of truckers and consolidators by their own employees or as, for example, the stuffing and stripping of certain types of cargo from containers owned or leased by, and in the possession and control of, the shipping companies.

denying the applications for enforcement, and remanding to the Board for further proceedings.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT
### 1974 Rules on Containers
### CONASA–ILA RULES ON CONTAINERS
### PREAMBLE

This Agreement made and entered into by and between the carrier and direct employer members of the CONASA Port Associations (hereinafter referred to collectively as "CONASA") and the International Longshoremen's Association, AFL–CIO ("ILA"), its Atlantic Coast District ("ACD") and its affiliated local unions in each CONASA port ("locals") covers all container work at a waterfront facility which includes but is not limited to the receiving and delivery of cargo, the loading and discharging of said cargo into and out of containers, the maintenance of containers, and the loading and discharging of containers on and off ships.

CONASA agrees that it will not directly perform work done on a container waterfront facility (as hereinafter defined) or contract out such work which historically and regularly has been and currently is performed by employees covered by CONASA–ILA Agreements, including CONASA–ILA craft agreements, unless such work on such container waterfront facility is performed by employees covered by CONASA–ILA Agreements.

### RULES

The following provisions are intended to protect and preserve the work jurisdiction of longshoremen and all other ILA crafts which was performed at deepsea waterfront facilities. These rules do not have any effect on work which historically was not performed at a waterfront facility by deepsea ILA labor. To assure compliance with the collec-

tive bargaining provisions, the following rules and regulations shall be applied uniformly in all CONASA Ports to all imports or export cargo in containers:

Definitions

(a) Loading a Container—means the act of placing cargo into a container.

(b) Discharging a Container—means the act of removing cargo from a container.

(c) Loading Containers on a vessel—means the act of placing containers aboard a vessel.

(d) Discharging Containers from a vessel—means the act of removing containers from a vessel.

(e) Waterfront facility—means a pier or dock where vessels are normally worked including a container compound operated by a carrier or direct employer.

(f) Qualified Shipper—means the manufacturer or seller having a proprietary financial interest (other than in the transportation or physical consolidation or deconsolidation) in the export cargo being transported and who is named in the dock/cargo receipt.

(g) Qualified Consignee—means the purchaser or one who otherwise has a proprietary financial interest (other than in the transportation or physical consolidation or deconsolidation) in the import cargo being transported and who is named in the delivery order.

(h) Consolidated Container Load—means a container load of cargo where such cargo belongs to more than one shipper on export cargo or one consignee on import cargo.

Rule 1—Containers To Be Loaded or Discharged by Deepsea ILA Labor

(a) Cargo in containers referred to below shall be loaded into or discharged out of containers only at a waterfront facility by deepsea ILA labor:

(1) Containers owned, leased or used by carriers (including containers on wheels and trailers), hereinafter

"containers", which contain consolidated container loads, which come from or go to any point within a geographic area of any CONASA port described by a 50-mile circle with its radius extending out from the center of each port (hereinafter "geographic area") or

(2) Containers which come from a single shipper which is not the manufacturer ("manufacturer's label") into which the cargo has been loaded (consolidated) by other than its own employees and such containers come from any point within the "geographical area," or

(3) Containers designated for a single consignee from which the cargo is discharged (deconsolidated) by other than its own employees within the "geographic area" and which is not warehoused in accordance with Rule 2 (b).

(b) Such ILA labor shall be paid and employed at deep-sea longshore rates under the terms and conditions of the deep-sea ILA labor agreement in each CONASA port, including the provisions for all fringe benefits and any and all other benefits receivable by deep-sea ILA craft workers in each such Port. No cargo shall be loaded into or discharged out of any container by ILA deep-sea labor more than once.

(c) All export consolidated cargo, described in 1 (a)(1) and (2) above, shall be received at the waterfront facility by deep-sea ILA labor and such cargo shall be loaded into a container at the waterfront facility for loading aboard ship.

(d) All import consolidated cargo, described in 1 (a)(1) and (3) above, shall be discharged from the container and the cargo placed on the waterfront facility where it will be delivered and picked up by each consignee.

(e) No carrier or direct employee shall supply its containers to any consolidator or de-consolidator. No carrier or direct employer shall operate a facility in violation of the Rules on Containers which specifically require that all Rule 1 Containers be loaded or discharged at a waterfront facility.

Rule 2—Containers Not to be Loaded or Discharged by ILA Labor

Cargo in containers referred to below shall not be loaded or discharged by ILA labor:

A. Export Cargo:

(1) All cargo loaded in containers outside the "geographic area".

(2) Containers loaded with cargo at a qualified shipper's facility with its own employees.

(3) Containers loaded with the cargo of a single manufacturer (manufacturer's label).

(4) Consolidated container loads of mail, household effects of a person who is relocating his place of residence, with no other type of cargo in the container, or personal effects of military personnel.

B. Import Cargo:

(1) All cargo discharged from containers outside the "geographic area".

(2) Containers discharged at a qualified consignee's facility by its own employees.

(3) Consolidated container loads of mail, household effects of a person who is relocating his place of business, with no other type of cargo in the container, or personal effects of military personnel.

(4) Containers of a qualified consignee discharged at a bona fide public warehouse within the "geographic area" which comply with all of the following conditions.

1. The container cargo is warehoused at a bona fide public warehouse.

2. The qualified consignee pays the normal labor charges in and out; and the normal warehouse storage fees for a minimum period of thirty or more days, and;

3. The cargo being warehoused (a) in the normal course of the business of the qualified consignee; (b) title to

such goods has not been transferred from the qualified consignee to another.

The carrier on request will furnish all documentation and other information which permits the Container Committee in the port to determine whether conditions 1, 2 and 3 have been met. This exception shall not apply where cargo is warehoused for the purpose of avoidance or evasion of Rule 1. It is limited to containers warehoused as provided in the above conditions and any warehouse which does not conform to such conditions shall be deemed a consolidator or deconsolidator.

Rule 3—Batching

When an employer-member or carrier uses a trucker to remove or deliver containers in batches, or in substantial number, from or to a terminal to another place of rest (outside of its terminal) where containers are stored pending their delivery to a consignee (or after being received from a shipper and while waiting the arrival of a ship), for the purpose of reducing the work jurisdiction of the ILA or any of its crafts, such use is deemed to be batching and an evasion of these Rules in violation of the CONASA–ILA contract.

Rule 4—Headload

Where a single qualified shipper sends an export container which contains all of his own cargo to a waterfront facility and such container is not full, the carrier or direct employer may load this container with additional cargo at the waterfront facility. On import cargo, the carrier or direct employer may discharge any such additional cargo and send the remaining cargo in the container to the qualified consignee. The loading or discharging of cargo at ILA ports shall be performed at a waterfront facility by deepsea ILA labor.

### Rule 5—Overland Movement of Containers from CONASA Port to Non-CONASA Port

If a carrier moves containers from a CONASA Port to a non-CONASA Port for the purpose of evading the Rules on Containers, the carrier is in violation of the CONASA–ILA Agreement. If the cargo is being moved to a non-CONASA–ILA Port in the normal course of business, and not for the purpose of evasion, then such movement is not a violation.

### Rule 6—Importers Advertising Evasion of Rules

The circulation, in writing, by importers of methods developed by them to evade the Rules on Containers by issuing single bills of lading on what are in fact consolidated container loads shall be deemed a violation and all CONASA–ILA Container Committees shall be advised to stop such evasion at the waterfront facilities.

### Rule 7—No Avoidance or Evasion

The above rules are intended to be fairly and reasonably applied by the parties. To obtain non-discriminatory and fair implementation of the above, the following principles shall apply:

(a) Geographic Area—Agreement in the Port to the geographic area as provided in Rule 1 is based on present consolidated movement patterns in the port. Should any person, firm or corporation for the purpose of evading the provisions of the Rules on Containers, seek to change such pattern by shifting its operations to, or commencing new operations at, a point outside said agreed upon geographic area, then either party may raise the question whether said point should be included within the said geographic area, and upon agreement that the purpose of the shift in its operations was to evade the provisions of the Rules on Containers, then said point shall be deemed to be within the said geographic area for the purpose of these rules.

(b) Containers Owned, Leased or Used—Containers owned, leased or used by companies which are affiliated either directly or through a holding company with a carrier or a direct employer shall be deemed to be containers owned, leased or used by a carrier or direct employer. Affiliation shall include subsidiaries and/or affiliates which are effectively controlled by the carrier or direct employer, its parent, or stockholders of either of them.

(c) Liquidated Damages—Failure to load or discharge a container as required under these rules will be considered a violation of the contract between the parties. Use of improper, fictitious or incorrect documentation to evade the provisions of Rule 1 and Rule 2 shall also be considered a violation of the contract. If for any reason a container is no longer at the waterfront facility at which it should have been loaded or discharged under the Rules, then the carrier or its agent or direct employer shall pay, to the joint Container Royalty Fund, liquidated damages of $1,000 per container which should have been loaded or discharged. If any carrier does not pay liquidated damages within 30 days after exhausting its right to appeal the imposition of liquidated damages to the Committee provided in Rule 9 (a) below, the ILA shall have the right to stop working such carrier's containers until such damages are paid.

(d) Any facility operated in violation of the Container Rules will not have service supplied to it by any direct employer and the ILA will not supply labor to such facility.

Rule 8—Renegotiation and Cancellation—No Arbitration

These Rules shall be in effect for the term of the CONASA–ILA Agreement, provided, however, that either party shall have the right to cancel the Rules on Containers at any time on or after December 1, 1974, on thirty (30) days written

notice of a desire to renegotiate the provisions of these Rules. Negotiations shall be held during such thirty (30) day period and if the parties are unable to agree by the end of such period, these Rules shall be deemed cancelled. Thereafter, the ILA shall have the right to refuse to handle containers and CONASA shall have the right to refuse to hire employees under the said Rules. The negotiations referred to above shall, under no condition, be subject to the grievance or arbitration provisions of any CONASA–ILA Agreement.

Rule 9—Enforcement of the Rules on Containers

To assure effective, fair and non-discriminatory enforcement of the above Rules, the following regulations shall apply:

(a) A Committee in each CONASA port represented equally by management and union shall be formed and shall have the responsibility and power to hear and pass judgment on any violations of these Rules. Any inability to agree shall be processed as a grievance under the applicable contract except as limited by Rule 8 hereof. A joint committee, known as the CONASA–ILA Container Committee, represented equally by management and labor and made up of representatives (to be mutually agreed upon) from each CONASA Port, namely, Boston, Rhode Island, New York, Philadelphia, Baltimore and Hampton Roads shall meet at least quarterly each year for the purpose of insuring uniformity in the interpretation of these Rules.

(b) A Committee of carriers, together with CONASA–ILA Container Committee will develop uniform documentation which shall be required to be prepared and maintained by all carriers in order to readily identify all Rule 1 containers which are subject to loading or discharging by deepsea ILA labor. It shall be the obligation of employer-members to clearly mark each con-

tainer's documentation as to whether or not it is a Rule 1 container, which shall be loaded or discharged. If a container's documentation is not clearly marked, it shall be deemed a Rule 1 container and it shall be loaded or discharged by deepsea ILA labor at the waterfront facility. With respect to all containers received at or delivered from the waterfront facility, a record of the same shall be made by ILA Checkers or Clerks. All carriers will distribute to all other carriers any and all information and devices which are being used by any person to circumvent the Rules on Containers. Any carrier whose attention is brought to a violation of the Rules shall immediately cease such violation and report the matter to the appropriate CONASA–ILA Container Committee and to the policing agency provided in (e) below in its port.

(c) Every import container destined to a point within 50-miles of a CONASA Port shall be delivered only on a delivery order. Every export container coming from a point within 50-miles of a CONASA Port shall be received only on a dock/cargo receipt. Such delivery orders and dock/cargo receipts shall certify the place of delivery and origin of the container, the name or names of the person to whom the cargo is being delivered and from which it is shipped, the identity of the owner of the cargo, weight of the cargo, identity of the cargo and the origin and final destination of the container. Copies of such delivery orders and dock/cargo receipts shall be available to the local port Container Committee and the policing agency provided for in (e) below.

(d) The Container Committee in each CONASA Port shall promulgate to all carriers and direct employers, and to the Container Committees in each CONASA Port, any and all interpretations of the Rules on Containers as and when they are made. This will include uni-

form interpretations as and when they are issued. The CONASA–ILA Container Committee shall also promulgate uniform interpretations to local port Container Committees, as and when they are issued.

(e) Policing Agency—Each CONASA Port shall establish a method of policing and enforcing these Rules on a uniform and non-discriminatory basis. No such method shall be implemented until presented to and approved by the joint CONASA–ILA Container Committee.

Rule 10—Container Royalty Payments

The two Container Royalty payments required by the CONASA–ILA collective bargaining agreements shall be payable only once in the Continental United States. They shall be paid in that ILA Port where the container is first handled by ILA longshore labor at longshore rates. The second container royalty payment (provided by paragraph 6 of the 1971–1974 CONASA–ILA Memorandum of Agreement) shall be continued and shall be used for fringe benefit purposes only, other than supplemental cash benefits, which purposes are to be determined locally on a port by port basis. Containers originating at a foreign port which are transshipped at a United States port for ultimate destination to another foreign port ("foreign sea-to-foreign-sea containers") are exempt from the payment of container royalties.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE STEWART, MR. JUSTICE REHNQUIST, and MR. JUSTICE STEVENS join, dissenting.

This case turns on the definition of the work in controversy. If viewed exclusively from the perspective of the ILA, without regard to other aspects of the transportation industry or to the evolutionary changes in methods of doing business, the work can be characterized broadly as the loading and unloading of vessels; that gives the contract Rules on Containers a plausible work preservation objective sufficient to escape what

would otherwise be a violation of § 8 (e) of the National Labor Relations Act. If viewed from the perspective of the consolidators and motor carriers—many of whose employees are also union members—the objective is not preservation of traditional longshoremen's work but a claim to work historically and traditionally performed by teamsters, truckers, and similar inland laborers. Which of these perspectives is chosen, in turn, depends on the view taken of the nature and function of a "container."

This is where the Court's analysis runs astray. To the Court, the work-in-controversy problem in the instant case is simply analogous to that involved in *National Woodwork Manufacturers Assn.* v. *NLRB,* 386 U. S. 612 (1967), or *NLRB* v. *Pipefitters,* 429 U. S. 507 (1977), although the Court disclaims this. Compare *ante,* at 508–509, with *ante,* at 509–510. But viewing the work in controversy, as we should, "under all the surrounding circumstances," *National Woodwork, supra,* at 644, the Court's analysis simply will not "wash." A door may be a door in the carpenter's world, and a pipe may be a pipe to the plumber, but a "container" can be seen as sometimes like the hold of a ship, sometimes like the trailer of a truck—and sometimes an independent component.

Because of the many functions of a container, it affects both sea and land transportation systems. The Court apparently recognizes the complexities involved, see *ante,* at 509–510, n. 23, but does not seem to respond to the logical inferences as did the Board, which has a vast reservoir of experience with day-to-day industrial operations. We cannot blink the reality of this technological innovation, nor can we, as the Court does, focus merely on one aspect of the work it has affected. The Board understood the complexities involved here; consequently, it invalidated only that part of the Rules on Containers whose primary effect was to influence the loading and unloading of containers functioning away from the pier as truck trailers. See 231 N. L. R. B. 351 (1977) and 236 N. L. R. B. 525 (1978). The Court's failure to appreciate

this distinction and unwillingness to concede its significance underscores the reason why reviewing courts must give weight to the Board's long and intimate experience with the workings of the industries implicated. See, e. g., Pipefitters, supra, at 531–532. Calling the issue one of law does not make it so.

The ILA argues that a container should be viewed as the functional equivalent of the hold of a ship. See, e. g., Brief for Respondent ILA 4. Superficially it can be made to appear that this Court has acquiesced in such an approach, but only in the context of discussing questions arising under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA). See Northeast Marine Terminal Co. v. Caputo, 432 U. S. 249, 270–271 (1977); P. C. Pfeiffer Co. v. Ford, 444 U. S. 69 (1979). Even in that narrow context, a careful reading of the Court's statements shows that what the Court characterized as "maritime employment" within the meaning of the LHWCA was the work of one who "moves cargo between ship and land transportation." Pfeiffer, supra, at 84. This characterization points toward the key to the proper view in this case—that the function of a container changes as it moves through the transportation system.

Prior to containerization, both consolidators and truckers functioned as part of the transportation industry. Teamsters and others loaded the vehicles used by the truckers and consolidators. When these vehicles reached the pier, longshoremen took over the task of moving the cargo onto the pier or into the ship's hold. Longshoremen also handled inbound cargo from the hold of the ship to the pier and until placed on a land-based truck. After that, any handling of the contents of the truck away from the pier was the work of others than longshoremen. See International Longshoremen's Assn. (Consolidated Express, Inc.), 221 N. L. R. B. 956, 959 (1975), enf'd, 537 F. 2d 706 (CA2 1976), cert. denied 429 U. S. 1041 (1977); 231 N. L. R. B., at 359, 365.

After the advent of containerization, truckers and consolidators still perform their traditional functions. 221

N. L. R. B., at 959; 231 N. L. R. B., at 365. Their employees still load and unload the vehicles they use, 221 N. L. R. B., at 960, but with containerization the cargo-carrying part of those vehicles is the removable container. When such a vehicle with outbound cargo reaches the pier, there is no need whatever for anyone to "unpack" it; the container may itself be lifted and placed in the hold of the waiting ship, which is designed so that the container fits it as it did the prefitted bed of the truck chassis. Similarly, a container carrying inbound freight is hoisted from the hold of the ship and placed on a truck chassis hooked up to a tractor; the tractor-trailer is driven away from the pier, and the container is then part of land transportation.

To me, the work in controversy has two aspects—loading and unloading ships and loading and unloading trucks. Under this view, the Rules on Containers at issue would be valid insofar as they regulate what happens to containers— as distinguished from their contents—while they are on the pier; but those Rules are invalid insofar as they attempt, through fines placed on the shipowner/employers, to regulate what happens to containers once they have left the pier for overland transportation.

The Court finds it sufficient to say that the main object of the Rules on Containers is to preserve the traditional longshore work of moving cargo between ship and land transportation. That is too simplistic a view; it closes the eyes to the other aspects of the transportation industry and to the evolution of methods of handling freight. For our purposes, the relevant work in controversy is that involved in the part of the Rules affected by the Board's orders and now here for review. It seems clear to me—as the Board saw—that the work which these Rules seek to control is the work of loading and unloading land-based transportation—the containers functioning as truck trailers—away from the pier; the record supports the Board's conclusion that such work has never been performed by longshoremen. See, *e. g.,* 231 N. L. R. B.,

at 365. Through this aspect of the Rules, the ILA turns reality on its head and seeks to take work from those who have traditionally performed it.[1] This is prohibited by § 8 (e).

The ILA complains that the loading and unloading of land transportation which takes place away from the pier could be done by them on the pier with equal efficiency. See Tr. of Oral Arg. 49, 51. But everyone except the ILA has found, from experience, that this is not true, and in any event this assertion shows that the ILA is trying to acquire the work of others. Because the modern, efficient mechanism of containerization has affected their work at the pier, the ILA is using the Rules to reach out and bring to the pier work which employees of land-based transporters have always performed. Under the work preservation doctrine, the longshoremen may seek to mitigate the effect on them of this new technology, but they may not lawfully do so by reaching out for work which they have not traditionally performed. It is a gross perversion of the work preservation doctrine to permit such conduct; that doctrine, as applied here, ceases to be a shield to protect work and becomes a sword to cut work away from those who have traditionally performed it.

When a prepacked container which "violates" the Rules is taken off its trailer at the pier, the ILA demands that its members be paid for the utterly useless task of removing the contents and then repacking them, or alternatively that a fine be imposed on the shipping company which owns or leased the container.[2] This is nothing less than an invidious

---

[1] This is thus far from a classic case of "labor" versus "management." Here, one segment of labor seeks to take work away from another segment, and to impose a "featherbedding" fine on employers as an enforcement device.

[2] It is natural, of course, for individuals—and unions—to want to "preserve" work which by long practice has been "theirs." But there must be a balancing of this urge with the need for innovation and change in methods that spell progress and reduce consumer cost. In the complaints of the ILA, one hears the echoes of the complaints of stablekeepers and

form of "featherbedding" to block full implementation of modern technological progress. Allowing compromises in the interest of those whose jobs are affected is one thing; but what the Court sanctions today is quite another—taking work from non-ILA members to provide economically useless work for ILA members.

The Court of Appeals was obviously ill at ease with its decision and sought comfort by trying to restrict its scope through the intimation that its holding was limited to the presently claimed 50-mile limit.[3] That court deceived itself, and the Court today puts on the same blinders in asserting that it is "groundless" to claim that the logic of its decision would allow the union "to follow containers around the country and assert the right to stuff and strip them far inland. . . ." *Ante,* at 510, n. 24. Should this occur, the Court states, "[t]hat work would bear an entirely different relation to traditional longshore work, and would require a wholly different analysis." *Ibid.*

It does not "reduce to absurdity," see n. 3, *supra,* to ask why 51 or 100 miles "would require a wholly different analysis." Following the Court's own strained reasoning, the work in controversy would still be the same—the longshoremen's

---

harness manufacturers when the automobile first gained wide acceptance. With practices such as those held permissible in this case, innovation and change in the utilization of modern machinery, methods, and labor will be retarded. Obsolete machinery and obsolete methods will tend to be used because industry will not be anxious to risk investment capital on labor-saving, cost-reducing methods and mechanisms if, by doing so, it must pay in tribute for the privilege a penalty that offsets the savings.

[3] That court's opinion recites: "It is not difficult to imagine a party unhappy with this court's decision today subjecting that decision to the following exercise in *reductio ad absurdum:* Under the court's ruling, cannot longshoremen literally chase containers around the country, demanding the right to stuff and strip them? There is a short answer: No. Our decision does not radiate beyond the Rules on Containers, which are restricted in terms to a 50-mile area around each port." 198 U. S. App. D. C. 157, 177, n. 177, 613 F. 2d 890, 910, n. 177 (1979).

work on the pier. Since they have never worked off the pier, the contested work could be nothing else. And, under the Court's analysis, "[t]he effect of work preservation agreements on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant to the validity of the agreement so long as the union had no forbidden secondary purpose to affect the employment relations of the neutral employer." *Ante,* at 507, n. 22.

By implying that the relevant work in controversy would suddenly shift from the pier to land if it occurred beyond the arbitrary 50-mile limit, the Court's opinion exposes its own error, much as the Court of Appeals comforted itself that the 50-mile point was the limit.[4] Since longshoremen's work is and has always been confined to work "on the pier," the actual work in controversy here bears the same relation to traditional longshore work as it would if it were performed 500 miles away. It simply is *not* traditional longshore work. By looking only at one aspect of the problem and refusing to look at the whole, as the Board did, the Court's holding recalls the blind person who, holding an elephant's tail, concludes it is a snake. The Court fails, as did the Court of Appeals, to explain why a 50-mile limit is acceptable while 50-plus would not be so, and hence sanctions a widening of the work preservation exception that completely swallows the rules of §§ 8 (e) and 8 (b)(4)(B).

It is argued that the current Rules represent a collectively bargained compromise as to the ILA's asserted right to strip and stuff all containers (or at least all owned or leased by the shipping companies) at the pier, but the fact that an agree-

---

[4] Even under the current Rules, the 50-mile point is not strictly the limit. If a consolidator or trucker operating within the 50-mile limit relocates or opens new operations outside the limit, the parties to the Rules may decide nonetheless that the sanctions of the Rules are to apply. See Rule 7 (a) of the 1974 Rules on Containers, reprinted in the Court's appendix, *ante,* at 518.

ment was collectively bargained cannot save it if its object is to violate the law. As the Board decreed, that part of the Rules which attempts to regulate, through the economic pressure of fines on the shipping companies, the loading and unloading of land transportation away from the pier is invalid under §§ 8 (e) and 8 (b)(4)(B) of the NLRA.

The Board's findings are supported by substantial evidence on the record considered as a whole, cf. *Pipefitters*, 429 U. S., at 531, and accordingly I would reverse the judgment of the Court of Appeals and remand with directions to enforce the Board's orders.