The BOSTON SHIPPING ASSOCIA-
TION, INC., Petitioner,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents.

New York Shipping Association, Inc.,
et al., Intervenors.

No. 82–1617.

United States Court of Appeals,
First Circuit.

Argued Jan. 6, 1983.

Decided May 4, 1983.

Allan van Gestel, with whom Robert P. Wasson, Jr., and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for petitioner.

Gordon M. Shaw, Atty., Federal Maritime Com'n, with whom William F. Baxter, Asst. Atty. Gen., C. Jonathan Benner, Gen. Counsel, Federal Maritime Com'n, Robert D. Bourgoin, Deputy Gen. Counsel, Federal Maritime Com'n, Bryant L. VanBrakle, Atty., Federal Maritime Com'n, Robert B. Nicholson, and Robert J. Wiggers, Attys., Antitrust Div., U.S. Dept. of Justice, Washington, D.C., were on brief, for Federal Maritime Com'n.

Donato Caruso, with whom C. Peter Lambos, and Lambos, Flynn, Nyland & Giardino, New York City, were on brief, for intervenor New York Shipping Ass'n.

Ernest L. Mathews, Jr., with whom Thomas W. Gleason, New York City, was on brief, for intervenor Intern. Longshoremen's Ass'n, AFL–CIO.

Francis A. Scanlan, and Deasey, Scanlan & Bender, Ltd., Philadelphia, Pa., were on brief, for intervenor Council of North Atlantic Shipping Associations.

Before CAMPBELL and BOWNES, Circuit Judges, and PETTINE,* Senior District Judge.

BOWNES, Circuit Judge.

The Boston Shipping Association (BSA) seeks reversal or remand of a Federal Maritime Commission (FMC) order adopting an administrative law judge's (ALJ) decision that Rule 10 of the Rules on Containers does not violate various provisions of the shipping laws. Rule 10, a product of collective bargaining between the International Longshoremen's Association (ILA) and various shipping employer groups, governs the collection of royalties imposed on containerized cargo. It provides that royalties are to be paid at the port of first handling. The gravamen of BSA's complaint is that the operation of Rule 10 with respect to Boston-bound cargo first delivered to the Port of New York and then transshipped by feeder barge to the Port of Boston results in unfair discrimination against the latter port. We affirm the FMC's order because it is supported by substantial evidence and is not contrary to law.

I.  *Facts and Proceedings Below*

This case marks another skirmish in the series of lawsuits which has accompanied

---

* Of the District of Rhode Island, sitting by desig-  nation.

the process of technological advance in the shipping industry. The history of this process is well-documented[1] and we need only summarize it briefly. Prior to the advent of containerization in the late 1950's trucks delivered loose—break-bulk—cargo to the piers and longshoremen then transferred this cargo piece by piece onto ships. Containerization involves the use of metal cargo containers as large as forty feet long, eight feet high, and eight feet wide. It allows many tons of cargo to be handled as a single unit rather than piece by piece. This reduces the time required to load or unload ships and cuts losses from pilferage and breakage. Containers also facilitate rapid transportation to and from the pier because they fit readily onto truck chassis.

Ever since containerization was introduced the protection of longshoremen from concomitant job displacement has been the most troublesome issue in collective bargaining negotiations between shipping industry employers and the ILA. This bargaining has yielded a series of compromises permitting employers to use all types and sizes of containers and to transport full shipper load containers[2] without longshoremen handling the contents. In return employers have agreed to collect container royalties to compensate longshoremen for the effects of containerization. In 1960 the so-called "Stein Award" established the "First Container Royalty" at $1.00 per ton. Eleven years later employers and the union agreed to the "Second Container Royalty" for the same amount. The 1977 Master Contract doubled the First Container Royalty to $2.00 per ton. Under the labor agreements both dollars of the First Container Royalty are distributed in cash to longshoremen and the Second Container Royalty is applied to defray the costs of longshoremen's fringe benefits.

BSA, the complaining party in the dispute before us, is a multiemployer bargaining association which represents management in all longshore collective bargaining affecting the Port of Boston. Its members—twenty-five commercial firms which include contracting stevedores and deep water carriers plus the Massachusetts Port Authority—own or operate virtually all of the facilities in the port that are used regularly in foreign and intercoastal trade. BSA is the unilateral administrator of the Container Royalty Program for the port. Steamship carriers, their agents, or stevedores transfer to BSA all container royalties that are paid in the Port of Boston. BSA transfers collections of the first dollar of the First Container Royalty and the Second Container Royalty to the BSA–ILA Pension Fund and pays collections of the second dollar of the First Container Royalty as cash benefits to longshore employees selected by the ILA locals in Boston.[3]

This case commenced when BSA filed with the FMC complaints against the New York Shipping Association (NYSA)[4] under the Maritime Labor Agreements Act of 1980, § 4, 46 U.S.C. § 814 (1976 & Supp. IV 1980), and the Shipping Act of 1916, § 22,

---

**1.** For complete accounts of the development of containerization and its impact on the industry, see, e.g., *NLRB v. International Longshoremen's Ass'n*, 447 U.S. 490, 494–97, 100 S.Ct. 2305, 2309–10, 65 L.Ed.2d 289 (1980) (containerization called "'the single most important innovation in ocean transport since the steamship displaced the schooner'" (quoting Ross, Waterfront Labor Response to Technological Change: A Tale of Two Unions, 21 Lab.L.J. 397, 398 (1970))); *Council of North Atlantic Shipping Ass'ns v. FMC*, 672 F.2d 171, 173–76 (D.C.Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982).

**2.** These are containers fully loaded with goods beneficially owned by a single shipper or consignee whose own employees load or unload the container at its place of business. *See NLRB v. International Longshoremen's Ass'n*, 447 U.S. 490, 497, 100 S.Ct. 2305, 2310, 65 L.Ed.2d 289 (1980).

**3.** This payment scheme appears to violate the Master Contract requirement, as embodied in the local Boston agreement, that both dollars of the First Container Royalty be used for cash distributions to longshoremen. BSA contended before the ALJ, however, that it in effect pays the first dollar of the First Container Royalty to Boston longshoremen, who then voluntarily contribute it to their pension fund.

**4.** NYSA is basically BSA's counterpart in the Port of New York.

46 U.S.C. § 821 (Supp. IV 1980).[5] BSA objected to Rule 10 of the Rules on Containers included in the 1977 and 1980 Master Contracts negotiated with the ILA.[6] Rule 10, the "first port rule," provided that container royalty payments shall be payable only once in the continental United States, at the port where the container is first handled by ILA longshoremen.[7] BSA's objection was that the rule did not require the forwarding of royalties collected at the first port to the port of ultimate destination; thus royalties imposed on cargo first handled at the Port of New York but ultimately headed for Boston were retained in New York and paid to that port's longshoremen.

The parties agreed to forego oral testimony and instead placed in the evidentiary record an agreed stipulation of facts and various other documents. The ALJ reported his factual findings and ultimate conclusions in an exhaustive memorandum. He noted that it had been the routine custom from the 1960's to impose royalties only once and at the first. port; this rule was formalized in the 1971–1974 Master Contract with the ILA and has remained in all subsequent contracts. BSA has continuously applied the rule and never objected to it in the 1971, 1974, or 1977 Master Contract negotiations. During these years BSA was represented in labor negotiations by the Council of North Atlantic Shipping Associations, Inc. (CONASA). NYSA was a member of CONASA until 1977, when it withdrew because it had been unable to convert other CONASA members to its view on certain bargaining issues. CONASA and NYSA each participated in negotiations with the ILA leading to the 1977 and 1980 Master Contracts. BSA's objections to the first port rule surfaced during the 1980 negotiations. A BSA proposal to change the rule was voted on and rejected by CONASA members and the rule remained in the 1980 Master Contract.

BSA's dissatisfaction with the rule stemmed from the expansion of feeder serv-

5. In an amended complaint BSA subsequently named the following respondents in addition to NYSA: the ILA, the Council of North Atlantic Shipping Associations (CONASA), the West Gulf Maritime Association, Inc., the Mobile Steamship Association, Inc., and the Southeast Florida Employer's Port Association, Inc. NYSA, CONASA, and the ILA have filed a brief as intervenors in this appeal.

6. The Rules on Containers have been the subject of much labor law litigation. For a brief history, see *International Longshoremen's Ass'n v. NLRB,* 613 F.2d 890, 906–08 (D.C.Cir. 1979), cert. denied, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). Most recently the NLRB, on remand from the Supreme Court, *NLRB v. International Longshoremen's Ass'n,* 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980), found that provisions in the Rules reserving for longshoremen any handling of containers performed within 50 miles of port have valid work preservation objectives and, with some exceptions, do not violate the National Labor Relations Act. *International Longshoremen's Ass'n,* 266 NLRB No. 54, 51 U.S.L.W. 2540 (Mar. 15, 1983).

7. The pertinent portions of Rule 10 are as follows:

The two Container Royalty payments, effective in 1960 and 1977 respectively, shall be continued and shall be used exclusively for supplemental cash payments to employees covered by the Management Agreements, and for no other purpose. The remaining royalty payment effective in 1971, also shall be continued and shall be used for fringe benefit purposes only, other than supplemental cash benefits, which purposes are to be determined locally on a port to port basis. The Container Royalty payments shall be payable only once in the continental United States. They shall be paid in that ILA port where the container is first handled by ILA longshore labor at longshore rates. Containers originating at a foreign port which are transshipped at a United States port for ultimate destination to another foreign port ("foreign-sea-to-foreign-sea containers") are exempt from the payment of container royalties. Container royalty payments shall be assessed against all containers moving across the continental United States by rail or truck in the foreign-to-foreign "LAND–BRIDGE" system.

Management and the Carriers agree that the payment of Container Royalties as provided in their agreements is of the essence of this agreement and if for any reason during the term of this agreement such payments cannot be made in their present form, then Management and the Carrier shall provide by some other form of assessment for the payment of equivalent amounts to be used for the same purposes as said Container Royalties are presently used.

ices for the transshipment of containers from the Port of New York to the Port of Boston. Such services have existed since the early 1970's and a barge feeder service has operated between the two ports since 1976. The ALJ found that to an increasing extent NYSA carrier members that used to ship containerized cargo directly to Boston have altered their methods of operation by first delivering the containers to New York and then transshipping them by barge or other vessel to Boston. Under Rule 10 the royalties on this cargo are paid and retained in New York, the port in which the cargo is first handled by ILA longshoremen. The ALJ found that from October 1, 1980 to June 30, 1981, $326,633.43 of container royalties on cargo transshipped to Boston were paid in the Port of New York and that from May 1, 1979 to September 30, 1980, such royalties totalled $638,565.57. In its complaint BSA alleged that Rule 10 violated various shipping laws because it unfairly discriminated against the Port of Boston. It requested the FMC to modify Rule 10 so that the port of destination rather than the first port would be the port of royalty collection and sought reparations for container royalties that had been "diverted" to New York.

The ALJ denied the requested relief, holding that "the alleged injury is both factually and legally insufficient to establish any violation of the shipping laws." He found no support in the record for BSA's charge that NYSA had dominated other employer negotiating representatives and controlled negotiations with the ILA. He pointed to evidence that employer representatives were free to disagree with NYSA and often did, including the incident in 1977 when NYSA withdrew from CONASA because other members would not accede to some of its positions. The ALJ also found no support for BSA's contention that Rule 10 necessitated the continued assessment of an additional charge—the "Boston Dollar" [8]—on cargo handled at the Port of Boston in order to maintain the actuarial soundness of fringe benefit funds, and thus

hurt the port's competitive position. He noted that the Boston Dollar was initiated in 1971 before the expansion of feeder services. Moreover, BSA presented no evidence to show that present revenues were inadequate to maintain the fringe benefit funds, that the container royalties paid to New York would meet any shortage and thus enable BSA to discontinue the Boston Dollar charge, that the Boston Dollar charge was a significant competitive factor, or that cargo was being diverted away from the port as a result of the charge. Although BSA did present evidence of a decline in Boston cargo volume for the year ended September 30, 1981, it presented no evidence indicating the cause of this decline. For all the record indicated, the decline could have been due to general recessionary conditions in the maritime industry. Thus, the ALJ held that Rule 10 did not violate the shipping laws.

The FMC adopted the findings and conclusions of the ALJ and maintained that BSA did not sustain its burden of proving Rule 10 unlawful. It characterized BSA's claims as "speculative." In its order the FMC noted that the alleged lost container royalties resulted directly from the use of the barge feeder service and not from the first port rule.

## II. *Analysis*

### A. *FMC Jurisdiction Over the Dispute*

■ Before addressing BSA's arguments on appeal we must first discuss the issue of FMC jurisdiction over Rule 10. NYSA argued before the ALJ that the first port rule falls within the labor exemption to the shipping laws. The theory behind this exemption is that labor laws and the NLRB, and not the shipping laws and the FMC, have been designed to handle collective bargaining issues. The Maritime Labor Agreements Act of 1980 resulted from a congressional attempt to clarify the jurisdictional boundary between these two areas of law. *See infra* p. 1236. After closely considering the issue of FMC jurisdiction the ALJ

---

8. The "Boston Dollar" is imposed at the rate of $1.00 per ton.

**1236**

concluded that the factual and legal determinations necessary to decide the question overlapped the analysis required to dispose of the case on the merits; his resolution on the merits rendered a conclusion on the jurisdictional question unnecessary.

For several reasons our resolution of the issues presented on appeal likewise does not require a determination of whether or not the FMC has jurisdiction over this dispute. First, the parties have not emphasized the jurisdictional question on appeal. BSA takes the position that the FMC had jurisdiction over this case; the FMC maintains that the issue is not a simple one to resolve, but that its finding on the merits that there has been no shipping law violation obviates the need for a resolution; and the intervenors do not discuss the issue. Second, our review of the law concerning the labor exemption to the shipping laws leads us to conclude that, at the very least, this case could not be dismissed summarily for lack of FMC jurisdiction. The Maritime Labor Agreements Act of 1980 exempts maritime labor agreements "except to the extent that such provisions provide for the funding of collectively bargained fringe benefit obligations on other than a uniform man-hour basis," and calls for FMC approval upon filing of assessment agreements providing for such funding. 46 U.S.C. §§ 841c & 814

(Supp. IV 1980). The Second Container Royalty, and the first dollar of the First Container Royalty as administered in the Port of Boston, appear to fall within this provision and thus appear not to fall within the labor exemption to the shipping laws. As to the nonstatutory labor exemption which was in effect prior to the Maritime Labor Agreements Act, the D.C. Circuit has stated that the Rules on Containers would not qualify for such an exemption and that the FMC has jurisdiction to consider their legality under the shipping laws.[9] *Council of North Atlantic Shipping Associations v. FMC,* 672 F.2d 171, 183, 188 (D.C.Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982). We merely conclude that the issue of FMC jurisdiction is a thorny one, and indeed perhaps more difficult to resolve than BSA's claims on the merits. Our affirmance on the merits renders a conclusion on the jurisdictional question unnecessary.

### B. *The Merits of BSA's Claims*

■ Our review of the factual determinations behind the FMC's order denying BSA's requested relief is governed by the substantial evidence test because these determinations have been the subject of a hearing on the record.[10] *See Administra-*

9. This D.C. Circuit case concerned a steamship association's tariff which incorporated, and in effect enforced, certain provisions of the Rules on Containers. Thus, there is some question whether the holding of FMC jurisdiction applies to the Rules on Containers as such. In dissent Judge MacKinnon noted the "very substantial distinction between collective bargaining agreements ... and tariffs" and criticized the majority for failing to acknowledge it. *Council of North Atlantic Shipping Ass'ns. v. FMC,* 672 F.2d at 190–91 (MacKinnon, J., concurring in part and dissenting in part). He speculated that a collective bargaining agreement containing the Rules on Containers may "in some sense" impose terms on shippers— who are not parties to the collective bargaining agreement—and thus not satisfy the requirements of the nonstatutory labor exemption, but emphasized that in this case the *tariffs* and *not the agreement* were in issue. *Id.* at 190. On close reading the case appears to leave open the question of whether the nonstatutory labor exemption covers the Rules on Containers.

10. The D.C. Circuit has held that the arbitrary and capricious standard, not the substantial evidence standard, applies to FMC approval of agreements under section 15 of the Shipping Act of 1916, 46 U.S.C. § 814, because hearings under this section are not required in all cases to be trial-type hearings. *U.S. Lines v. FMC,* 584 F.2d 519, 526, 536–37 (D.C.Cir.1978). This statute has since been amended to provide for FMC review upon the filing of a complaint, the procedure followed by BSA in this case. Thus, the statute now seems to envision a more adjudicative type of proceeding—although there is no explicit requirement of a hearing *on the record*—and to lend itself to substantial evidence review. In any case, we are aware of the blurred distinction between the substantial evidence and arbitrary and capricious standards. *See generally* Davis, Administrative Law Treatise § 29.00–1, at 520–23 (Supp.1982). We view a substantial evidence review as the more rigorous of the two and, more importantly, think our holding in this case would be the same under either standard.

tive Procedure Act, 5 U.S.C. § 706(2)(E) (1976). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Consolo v. FMC,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). The Supreme Court's classic delineation of substantial evidence bears repeating: "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* In assessing the existence of substantial evidence supporting the FMC's order we consider the ALJ's decision to be an important part of the record. *See National Association of Recycling Industries v. FMC,* 658 F.2d 816, 824 (D.C.Cir.1980).

The essence of BSA's complaint in this case is that due to the expansion of barge feeder service the first port rule no longer serves the purpose of the Container Royalty Program and that the Port of Boston is being harmed as a result. The royalties were intended to compensate ILA longshoremen for lost work opportunities caused by containerization. As long as containerized cargo destined for Boston was shipped directly to Boston the first port rule operated to compensate Boston longshoremen for the work they lost. Now, however, much of this cargo is unloaded first at the Port of New York and transshipped by barge to Boston. Under the first port rule royalties on this transshipped cargo are retained in New York and benefit longshoremen there. BSA's views this as unfair discrimination against the Port of Boston in violation of the following provisions of the shipping laws: sections 15, 16, 17, and 18 of the Shipping Act of 1916, 46 U.S.C. §§ 814–817; section 8 of the Merchant Marine Act of 1920, 46 U.S.C. § 867; and section 205 of the Merchant Marine Act of 1936, 46 U.S.C.

§ 1115. BSA argues that the FMC should modify the rule to provide that, regardless of where or how collected, container royalties be allocated to the port of destination for import cargo and the port of embarkation for export cargo.

It is difficult to discern exactly how Rule 10 violates these various statutory provisions. Except for several references to section 15 of the Shipping Act of 1916, BSA largely presents its arguments in general terms and fails to explain the alleged violations with analysis of the relevant statutory language. Of the statutes allegedly violated, sections 15 and 16 of the Shipping Act of 1916 appear to have the most relevance to this dispute. Section 15 calls for the FMC to "disapprove, cancel, or modify" any agreement filed with it pursuant to that section which the FMC finds to be "unjustly discriminatory or unfair as between carriers, shippers, or *ports.*" 46 U.S.C. § 814 (1976 & Supp. IV 1980) (emphasis added). Section 16 lists discriminatory acts prohibited by the shipping laws and includes in the list the giving of "any undue or unreasonable preference or advantage to any ... *locality.*" 46 U.S.C. § 815 (1976) (emphasis added).[11] A review of cases in which the complaining party alleged unfair discrimination against a port breathes life into these provisions and raises doubt that Rule 10 causes such discrimination as contemplated by the shipping laws.

The court in *Dart Containerline Co. v. FMC,* 639 F.2d 808 (D.C.1981) considered a freight tariff filed by Dart which provided for container shipment of unmanufactured tobacco from the port of Wilmington, North Carolina to Europe at port-to-port rates. Dart offered no direct service from Wilmington to Europe; instead, it intended to carry the tobacco by truck from Wilmington to Norfolk, Virginia, at its own expense and then ship it from there to Europe. After the North Carolina Ports Authority filed a complaint challenging this tariff the

---

11. This section applies to acts by "any common carrier by water, or other person subject to this chapter." 46 U.S.C. § 815 (1976). It would appear that most employers represented in the collective bargaining agreements containing Rule 10 would be "other persons subject to this chapter" as defined at 46 U.S.C. § 801 (1976).

FMC held that the tariff unlawfully diverted cargo away from Wilmington. The reviewing court found that there was substantial evidence to support the FMC's conclusion that the tariff violated section 16 of the Shipping Act of 1916 because the diverted cargo was "naturally tributary" to Wilmington and because the diversion was unreasonable.[12] Noting that Dart's plan would "deprive[ ] Wilmington of geographic and inland rate advantages," the court approved the FMC's conclusion that competition which enhances productivity, and not competition resulting from artificial inducements to shippers, best serves shipping commerce. *Id.* at 818–19.

In *Port of Houston Authority v. Lykes Bros. Steamship Co.,* 19 F.M.C. 192 (1976), the complainant Port of Houston Authority alleged that the pricing structures of twenty-eight carriers violated sections 16 and 17 of the Shipping Act of 1916 because they unfairly diverted cargo from Houston to Corpus Christi and Galveston. The cargo in question was cotton being exported internationally from Texas. The diversion of cargo from Houston allegedly occurred because the carriers absorbed certain costs otherwise chargeable to shippers at Corpus Christi and Galveston and passed these costs along to shippers at Houston. The resulting lower price for shippers using the Corpus Christi and Galveston ports allegedly harmed Houston's competitive position. The FMC noted that the complaining party in a section 22 complaint proceeding always has the burden of proof and held that it had to deny Houston's complaint for failure to meet this burden. *Id.* at 200. Houston had not shown that the costs absorbed by the carriers at the other two ports were properly chargeable to shippers. Stating that the Shipping Act did not require all carriers or ports to offer the same services, the FMC concluded that Houston had failed to prove the existence of any price differences that unfairly injured any party. *Id.* at 200–01.

The FMC heard another complaint alleging unfair discrimination against a port in *Port of New York Authority v. AB SVENSKA AMERIKA LINIEN,* 4 F.M.B. 202 (1953). The complaint centered on a $1.00 rate differential the respondent common carrier by water imposed on wood pulp transported into the Port of Newark as compared to wood pulp transported into other North Atlantic ports. The complainant showed that in the year after the carrier imposed the higher rate in Newark imports of wood pulp dropped about fifty percent there, while dropping only twenty-two percent at the neighboring Port of Philadelphia. The FMC stated that in order to prevail on a charge of unjust discrimination against a port the complainant had to prove (1) that the complaining port and the allegedly preferred port were competing against one another, (2) that the alleged discrimination was the proximate cause of injury to the complaining port, and (3) that such discrimination was undue or unreasonable. *Id.* at 205. It found the ports of Newark and Philadelphia to be in competition for the importation of wood pulp, but that the complainant had not proved that the rate differential was the proximate cause of the sharper drop in volume in Newark than in Philadelphia. The only evidence offered on the issue of proximate cause had been uncorroborated rumors that importers were avoiding Newark due to the differential. Consequently, the FMC dismissed the complaint for lack of proof of unfair discrimination. *Id.* at 208–09.

■ The primary objective of the shipping laws administered by the FMC is to protect the shipping industry's customers, not members of the industry. *Council of North Atlantic Shipping Associations v. FMC,* 672 F.2d at 191 (MacKinnon, J., concurring in part and dissenting in part). The cases discussed indicate that the prohibitions of unfair discrimination between ports serve this objective by ensuring fair competition in the industry. The court in *Dart,*

---

12. The diversion in this case was unreasonable because there was a clear possibility of substantial harm to the Port of Wilmington, there was no showing that the port was inadequate to handle the tobacco, and there were no operational problems prohibiting Dart from providing direct service there.

for example, expressed concern for preserving Wilmington's natural advantages as a port for the export of tobacco and fostering competition that would enhance productivity. *Dart,* 639 F.2d at 818–19. Although the service Dart intended to offer might have benefitted tobacco shippers in the short run, in the long run Dart's artificial inducement could have seriously harmed the port at Wilmington and perhaps eliminated it as the naturally most cost efficient and convenient port for those shippers. Although unfair discrimination was not found, the other two cases also show that the focus is on shipping rates and artificial inducements which divert cargo from a port and in the long run could injure shippers and maritime commerce.

■ The alleged unfair discrimination against the Port of Boston which BSA complains of does not involve artificial inducements or other such aberrations in maritime commerce. This is demonstrated by the fact that under BSA's proposed alternative to Rule 10 container royalties would still be collected at the first port. BSA's proposal would have an "internal" effect only—the first port would now forward royalties collected to the port of destination—and would have absolutely no effect on the shippers who pay the royalties. Shippers would still pay the same dollar amount in royalties and would still pay it in New York on cargo transshipped to Boston. In collective bargaining negotiations the ILA has insisted upon the Rule because of its concern that under a different collection scheme a carrier could avoid the royalties by trucking containers to inland facilities near destination ports.

The internal nature of BSA's proposed solution suggests that its problem with Rule 10 should be considered during collective bargaining and that it is not the type of issue that the shipping laws were designed to address. This conclusion is reinforced by comparing this case with *Council of North Atlantic Shipping Associations v. FMC,* 672 F.2d 171 (D.C.Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982), a case which concerned the implementation by tariff of certain other provisions of the Rules on Containers. The FMC in that case adopted an ALJ's conclusion that the tariffs violated the shipping laws because, *inter alia,* they discriminated against certain categories of shippers. Specifically, the tariff treated an export shipper within fifty miles of a port who loaded a container at its own facility more favorably than a shipper whose container was loaded at a public warehouse or a shipper whose goods were consolidated in a container load. The ALJ held that these differences were not "justified by differences in the transportation services provided by the steamship company, which in each case simply transports a sealed container aboard its vessel." *Id.* at 179 (footnote omitted). That the court of appeals remanded this case, over a strong dissent, for FMC reconsideration in light of intervening judicial decisions does not detract from its usefulness here. It shows that at least some of the Rules on Containers may indeed violate the shipping law prohibitions of unfair discrimination, but only when the alleged discrimination has a cognizable effect on shippers or maritime commerce. Such an effect is lacking when, as in the case before us, the alleged discrimination can be remedied without altering in any way the manner of imposing the costs on customers of the shipping industry.

BSA argues that the FMC imposed an improper burden of proof upon it and that its sole burden should have been to establish a prima facie case of unfair discrimination. We first note that FMC regulations place the burden of proof in complaint proceedings such as this upon the proponent of the order sought, in this case BSA. *See* 46 C.F.R. § 5021.155 (1982). In the above discussed cases of alleged undue discrimination against a port the FMC consistently adhered to this allocation of the burden of proof. *See, e.g., Port of Houston Authority v. Lykes Bros. Steamship Co.,* 19 F.M.C. at 200 ("The burden of proof in a section 22 complaint proceeding is always upon the complainant."). More importantly, the record clearly shows that BSA has failed to establish even a prima facie case of unfair discrimination against the Port of Boston.

Thus, the FMC's order should be affirmed regardless of which party properly had the ultimate burden of proof.

BSA and the FMC both agree that BSA must establish the three elements set forth in *Port of New York Authority v. AB SVENSKA AMERIKA LINIEN,* 4 F.M.B. at 205: (1) that the complaining port and the allegedly preferred port were in competition, (2) that the discrimination complained of was the proximate cause of injury to the complaining port, and (3) that such discrimination was unreasonable. Our review of the record indicates that, although the parties have agreed that the Ports of Boston and New York are in competition, BSA has failed to establish the second and third elements.

■ As to the second element, BSA states that the ALJ found that the Port of Boston suffered losses of $638,565.57 and $326,633.43 in container royalties "solely as a direct result of Rule 10's failure to require that container royalties be forwarded to the port where the cargo is ultimately destined." It characterizes the ALJ's finding as a *"prima facie* finding of discrimination" and as a conclusion that BSA had established the second element of its case. BSA, however, reads too much into the ALJ's factual finding of the amount of container royalties attributable to the transshipped cargo in question. Although this finding indicates a showing of harm to the Port of Boston, it in no way suggests that BSA has established either discrimination or proximate cause. As to discrimination, aside from our conclusion that Rule 10 is not discriminatory in the sense contemplated by the shipping laws, the simple answer is that the first port rule applies to all Atlantic and Gulf ports. As to proximate cause, the FMC correctly stated that Boston's loss of container royalties to the Port of New York was a direct result of the barge feeder service, not Rule 10. The evidence in the record clearly shows that BSA never objected to the first port rule—and in fact continuously adopted and implemented it—until the barge feeder service expanded. This service, however, appears to have been a natural market reaction or evolution in cargo transport services stemming from containerization. In the absence of an allegation such as that of collusion between NYSA and the barge feeder services to redirect Boston-bound cargo through New York we cannot conclude that BSA has established the existence of any redressable discrimination.

■ With respect to the third element of BSA's requisite prima facie case, even if we were to assume that the operation of Rule 10 was discriminatory we would not consider such discrimination unfair or unreasonable. BSA relies heavily upon *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), for the proposition that there has been unfair discrimination here because there is no longer a reasonable correlation between lost work opportunities caused by containerization and a rule intended to compensate therefor. *Volkswagenwerk* resembles this case in that it concerned the allocation among shipping industry employers of assessments for a fund to mitigate the impact of technological job displacement. It is, however, distinguishable—and more analogous to *Council of North Atlantic Shipping Associations v. FMC,* 672 F.2d 171, —in that it involves the implementation of these assessments and the resulting higher than usual rates imposed on shippers of automobiles. In its opinion the Court acknowledged the economic reality that most stevedoring contractors and terminal operators passed the assessment on to customers. *Volkswagenwerk,* 390 U.S. at 273, 88 S.Ct. at 936. Similarly, we recognize the same economic reality with respect to Rule 10. We find it distinguishable not so much because it is an internal agreement among employers, but because as fully implemented it does not have a cognizable effect on shippers or maritime commerce.

There is substantial evidence in the record to support the conclusion that Rule 10 satisfies the requirements set out in *Volkswagenwerk* and not met in that case. In his concurrence Justice Harlan advised the FMC to closely consider the language of

section 16 of the Shipping Act of 1916—"undue and unreasonable preference"—in determining whether the burdens of accumulating the fund had been fairly allocated. Recognizing that there was no "perfect" way to allocate the costs, he stated that the analysis "must leave room for the implementation of some uniform, practical, general rule of assessment even though it have some features that are less desirable than some alternative imperfect rule." *Id.* at 293, 88 S.Ct. at 946 (Harlan, J., concurring). He viewed the assessment allocation in *Volkswagenwerk* as problematic because "it was not uniform and general but made special provision for automobiles." *Id.* The Court expressed similar sentiments in analyzing the allocation under section 17 of the Act when it required a "reasonable" correlation of benefits realized to burdens imposed. *Volkswagenwerk,* 390 U.S. at 282, 88 S.Ct. at 940 (majority opinion).

The ALJ in the instant case considered factors relevant to the issue of the unfairness or unreasonableness of the alleged discrimination and the record contains substantial evidence to support his conclusion that BSA has not established the third element of its prima facie case. The ALJ acknowledged that New York, due to its size and prominence, has been the "bellwether" in longshore collective bargaining, but reasonably concluded that New York did not dominate the negotiations leading to Rule 10. When it was a member of the shipping association CONASA, NYSA possessed forty percent of the vote. That this voting percentage did not amount to effective control is demonstrated by NYSA's withdrawal for failure to prevail within CONASA on certain labor issues. Although perhaps imperfect with respect to transshipments of imports destined for Boston, Rule 10 is clearly a uniform, practical, and reasonable rule as required by *Volkswagenwerk.* Recognizing that Rule 10 affects ports from Maine to the Gulf of Mexico, the ALJ adopted an appropriate macroeconomic approach and hesitated to change the Rule without information about the impact this would have on the other ports. BSA failed to present sufficiently detailed data about barge feeder services at other ports or

about other services affecting Boston, such as one service from Canada, to enable us to conclude that Rule 10 no longer produces a reasonable correlation between the allocation of container royalties and job displacement caused by containerization. Its discussion of Boston's relatively high ratio of imports to exports perhaps discloses imperfection in the first port rule, but not imperfection of such magnitude that the rule can no longer be characterized as a reasonable method of allocating the burdens and benefits of the Container Royalty Program.

We reiterate that BSA's complaint seems to be a matter more appropriately addressed during labor negotiations than by the FMC or the courts. Indeed, other CONASA members appear to have been sympathetic and to have given BSA fair consideration when it raised the issue during the 1980 negotiations. The proposal's rejection after such consideration provides an indication that most shipping industry employers believe Rule 10 to continue to be the most reasonable rule in the circumstances. Having found substantial evidence in the record to support the FMC's conclusions and having carefully considered the applicability of the shipping laws, we conclude that Rule 10 does not unfairly discriminate against the Port of Boston.

*Affirmed.*