**TRUCK DRIVERS, OIL DRIVERS, FILLING STATION AND PLATFORM WORKERS' UNION LOCAL 705, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Emery Air Freight Corp., Intervenor.**

No. 86–1254.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 13, 1987.

Decided June 9, 1987.

As Amended Aug. 4, 1987.

Sheldon M. Charone, Chicago, Ill., for petitioner.

Mark S. McCarty, Atty., N.L.R.B., with whom Robert E. Allen, Associate General Counsel, Elliott Moore, Deputy Associate General Counsel and Peter Winkler, Supervising Atty., N.L.R.B., Washington, D.C., were on the brief, for respondent.

David A. Grant, with whom Betty Southard Murphy, Washington, D.C., was on the brief, for intervenor.

Before WALD, Chief Judge, and BORK and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioner Truck Drivers, Oil Drivers, Filling Station and Platform Workers' Union, Local 705, a Teamsters affiliate, seeks review of a National Labor Relations Board order finding that the union violated section 8(b)(4)(ii)(B) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(b)(4)(ii)(B) (1982). The Board determined that the union had a secondary objective in striking and threatening to strike Intervenor Emery Air Freight Corporation, and in filing a grievance against Emery. The NLRB filed a cross-application for enforcement of its order. We enforce the Board's order with respect to the threats to strike and the strike, but, because of insuf-

ficient explanation, remand to the Board for reconsideration of its determination that the union's presentation of the grievance was unlawful.

### I.

Emery operates an overnight air delivery service, with facilities at approximately 120 locations throughout the United States. Operations at its facility in the Chicago suburb of Des Plaines, Illinois, are the focus of this dispute. Emery picks up outgoing packages from customers at various locations in the Chicago area, transports them to the Chicago facility, and then loads them into large containers called "huts." These huts are then driven to O'Hare International Airport and placed aboard waiting airplanes for shipment to Emery's nationwide hub in Dayton, Ohio. Similarly, incoming huts are off-loaded from airplanes and driven to the Chicago facility, where they are emptied of their contents. The individual packages are then sorted and delivered to their respective addresses.

Two different groups of workers are involved in these operations, those hired directly by Emery, and those employed by Emery's subcontractors. Emery directly employs approximately twenty truckdrivers, called airport transfer drivers. Represented by Local 705, these employees at the time of the strike worked for Emery under a collective bargaining agreement— the Air Freight Forwarders and Related Companies Joint Cartage Agreement ("Cartage Agreement"). These drivers perform two tasks, one being to ferry the huts between the Chicago facility and airplanes at O'Hare. In addition, the drivers pick up and deliver approximately one percent of the total number of customer packages shipped in and out of the Chicago facility daily. This second task, which apparently takes up less time than the airport shuttle work, was described by the Administrative Law Judge as covering "specially handled items from particular customers and emergency or overflow work."[1]

---

1. Emery's airport transfer drivers do customer pick up and delivery work under three separate circumstances, according to testimony before the ALJ by Jack Harper, service manager of Emery's Chicago facility. Five to seven times during an average day Emery's drivers deliver

The vast bulk of the work of collecting packages from customers and delivering packages to customers is done not by Emery employees but by subcontractors. For many years, Emery utilized Stepina Motor Service, Inc. ("Stepina") and Emergency Delivery, Inc. ("EDI") to perform this work. Stepina (which did 75 percent of the work) and EDI both employed members of an independent union, the Chicago Truck Drivers, Helpers and Warehouse Workers Union ("CTDU"), and had a collective bargaining agreement with CTDU under which Stepina and EDI employees worked full time and were paid wages and benefits equivalent to those paid under the Cartage Agreement.

The threats, strike and grievance involved in this case were precipitated largely by Emery's efforts to reduce the costs of its customer pick up and delivery work by shifting to part-time drivers. Emery approached Stepina with a proposal under which Stepina's drivers would have worked only part time, but Stepina declined to accept Emery's terms. Thereafter, Emery investigated two alternatives for replacing Stepina. The first was to hire a new subcontractor—DPD, Inc. ("DPD"), a subsidiary of Ryder Systems, Inc., and the second was to hire directly additional, part-time drivers. Emery entered into talks with Local 705 regarding that later possibility, but Local 705 insisted that all Emery employees it represented be guaranteed eight hours of work per day.

During the month of September, 1984, while Emery was negotiating with Local 705 as well as the prospective new subcontractor, DPD, concerning the work done by Stepina, Local 705's business agent, Richard Volkmar, on four occasions threatened Emery with a strike. On September 4, Volkmar told Daniel Shea, an Emery vice president, that Emery would be struck if it gave the Stepina work to a subcontractor lacking a collective bargaining agreement with either Local 705 or CTDU. On September 11, Volkmar told Jack Harper, service manager at Emery's Chicago facility, that Local 705 would strike Emery if Emery hired DPD. Later the same day, Volkmar telephoned a similar message to Shea—indicating that Emery would be struck if DPD did not have a contract with Local 705 or CTDU. Finally, on September 12, Volkmar relayed to Harper a statement by Local 705's spokesman, Louis Peick, that Local 705 would strike if DPD replaced Stepina. Two days later, on September 14, Peick met with Shea in person and informed him Local 705's *only* concern was that Emery hire a subcontractor that paid wages and benefits equivalent to those currently paid Emery employees under the Cartage Agreement.

Emery replaced Stepina with DPD, which employs only non-union drivers, on October 13. On Monday, October 15, former Stepina employees represented by CTDU set up picket lines outside Emery's Chicago facility. That morning approximately fifty of Emery's employees gathered outside the facility, along with Volkmar and Local 705's president and shop steward. When several employees asked Volkmar what to do, he responded that they could do whatever they wanted. The employees took an informal vote in the presence of the union leaders and decided not to report to work. Volkmar then told them to disperse and show up each day to find out what was happening. None of Emery's employees returned to work until the CTDU picket lines were withdrawn at the end of the week. In response, Emery filed an unfair labor practice charge against Local 705.

On October 24, soon after the strike ended, Local 705 filed a grievance alleging that Emery had violated its collective bargaining agreement by subcontracting out the pick up and delivery work (formerly done by Stepina) to a company that did not pay "area benefits and wages which are received by drivers under the agreement."

packages for which shippers have paid up to $150 extra to receive expedited handling. In addition, the drivers regularly make pick ups and deliveries at off hours for special customers—IBM and Xerox, for example. These runs generate approximately 35 shipments daily, some consisting of multiple packages. Finally, Emery's drivers make mid-day deliveries of packages that have been delayed or misrouted.

Local 705 asserted that Article 13, section 2 of the Cartage Agreement,[2] interpreted in light of past practice, precluded any subcontracting to employers who paid less than union wages. The Cartage Agreement provided that grievances were to be submitted to a Joint Grievance Committee composed of six union representatives and six chosen by trucking industry associations, and that majority decisions by the Committee were "final and binding." Local 705 brought the grievance before a board comprised of eight members, which held a hearing and announced orally that it upheld the grievance. In response to the grievance, Emery filed a second charge with the NLRB, alleging that the filing of the grievance was itself an unfair labor practice.[3] Thereafter, the NLRB found that Volkmar's threats, the strike by Emery's employees, and Local 705's filing of the grievance each constituted a violation by the union of section 8(b)(4)(ii)(B).

## II.

■ The Board determined that Volkmar's four statements to Emery officials in early September were violations of section 8(b)(4)(ii)(B) of the Act because they were "an unambiguous attempt to force Emery, a neutral employer, to cease doing business with DPD or any other drayage company that did not have a contract with [Local 705] or CTDU." Local 705 does not deny that the literal language of Volkmar's threats indicates an intention to prevent Emery from hiring DPD as a subcontractor so as to induce DPD to sign a contract with either Local 705 or CTDU. Nor does the union quarrel with the Board's legal conclusion that a union exercises secondary pressure when, with the aim of gaining

benefits for those outside the immediate bargaining unit, it induces an employer to boycott subcontractors who do not have union contracts. *Accord Orange Belt District Council of Painters No. 48 v. NLRB*, 328 F.2d 534, 538 (D.C.Cir.1964); *Meat and Highway Drivers v. NLRB*, 335 F.2d 709, 717 (D.C.Cir.1964); *Local 644, United Brotherhood of Carpenters and Joiners v. NLRB*, 533 F.2d 1136, 1146 (D.C.Cir.1975). Rather, Local 705 argues that the Board should not have accepted Volkmar's threats at face value because surrounding circumstances—including the September 14 statement by union spokesman Peick—indicate that the threats were in reality motivated only by a desire to protect bargaining unit employees by preventing Emery from subcontracting out below union wages. We accept the Board's factual findings as to Local 705's intentions, however, because they are amply supported by evidence on the record, *see NLRB v. Denver Building & Construction Trades Council*, 341 U.S. 675, 691, 71 S.Ct. 943, 952, 95 L.Ed. 1284 (1951), and thus we enforce the Board's orders with respect to the threats.

■ The Board adopted the Administrative Law Judge's finding that the strike also constituted a violation of section 8(b)(4)(ii)(B). Local 705 objected to the ALJ's findings with respect to the strike solely on the ground that the union was not responsible for the Emery employees' refusal to cross the CTDU picket line, pointing to evidence that no union official explicitly urged the Emery employees to strike prior to the vote. Local 705 thus argues that only individual employees bore the responsibility. We believe, however, that the Board reasonably inferred from the evidence—including Volkmar's repeated

---

2. Article 13, section 2, of the Cartage Agreement states in part:

> For the purpose of preserving work and job opportunities ... no work or services presently performed or hereafter assigned to the collective bargaining unit will be subcontracted ... outside the jurisdictional area of [Local 705] unless otherwise provided in this Agreement. The Employer may subcontract overflow loads when all of the Employer's Employees are working, provided, however. (1) that each person who performs subcontracted

overflow loads shall receive the full economic equivalent of the wages, hours and other conditions of employment provided for in this Agreement ...

3. Emery also filed an action in federal court in the Northern District of Illinois, under section 301 of the Labor-Management Relations Act, 1947, 29 U.S.C. § 185 (1982), to set aside the grievance award on a number of grounds. The district court stayed the action pending this court's decision in this case.

threats of a strike, and the presence of union leaders at the strike vote—that Local 705 was indeed responsible for the strike, and therefore we enforce the Board's order as supported by substantial evidence.[4]

### III.

■ The Board held, as we noted, that Local 705's filing of the grievance was a further attempt, in violation of section 8(b)(4)(ii)(B), to force Emery to cease doing business with DPD. The Administrative Law Judge, whose recommendation the Board declined to adopt, had determined that under *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), the filing of the grievance could not constitute an unfair labor practice since the union had prevailed before the grievance board. In *Bill Johnson's* the Supreme Court held that the NLRB cannot hold an employer's state libel action against his employees to be an unfair labor practice, regardless of the employer's motivation, if the employer prevails. *Id.* at 747, 103 S.Ct. at 2172. The ALJ saw no relevant distinction between an action in state civil court and a grievance procedure to enforce a collective bargaining agreement, and thus held that the union's filing of the grievance was legal. The Board, on the other hand, assumed *arguendo* that *Bill Johnson's* applies to grievances, but focused on footnote 5 in the Supreme Court opinion, which indicates the holding does not cover a lawsuit that "has an objective that is illegal under federal law"—where, for example, the remedy "could not lawfully be imposed under the Act." 461 U.S. at 737 n. 5, 103 S.Ct. at 2166 n. 5. The Board concluded that the union's object in filing the grievance was illegal and therefore *Bill Johnson's* did not provide protection. The object was illegal, according to the Board, because it was

secondary, and the grievance was not designed to preserve bargaining unit work because the subcontracted work (formerly performed by Stepina's employees) had never been performed by Local 705's unit members.

The Board's analysis omits some essential steps. It is irrelevant under *Bill Johnson's* whether Local 705's motive in filing the grievance was to impose secondary pressure on Emery. If the grievance had an unlawful objective, the contract provision sought to be enforced must *itself* have been illegal. The Board, however, did not so hold. To be sure, the clause in the contract that the union claimed Emery violated does not, it might be argued, on its face, support the petitioner's interpretation—that it is an area standards agreement. But the grievance board, whose interpretation of the agreement Emery bargained for, accepted the union's position. Although Emery has sought review in a federal district court of the grievance board's authority and interpretation, *see supra* note 4, the Board has not questioned the grievance board's ruling. Indeed, it is not at all clear that it could. *See Darr v. NLRB*, 801 F.2d 1404, 1408–09 (D.C.Cir.1986). Thus, since the grievance board concluded that the existing contract barred subcontracting of the Stepina work below area standards, and Emery's contract with DPD would appear to transgress that prohibition, the union's attempt to enforce its agreement would seem illegal only if the agreement itself was secondary—in other words a "hot cargo" agreement in violation of section 8(e) of the Act, 29 U.S.C. § 158(e) (1982). In determining the agreement's legality, the Board must, to be sure, consider whether it had a legitimate work preservation objective, or was instead directed at affecting the for-

---

4. The ALJ made a determination—which the Board adopted—that the strike had been "directed specifically against DPD because DPD was not observing area standards." "As such," the ALJ concluded without further analysis, the strike was a violation of section 8(b)(4)(ii)(B). Local 705 argues before this court that the ALJ incorrectly held the strike to be secondary *per se* because aimed at forcing Emery to hire only

subcontractors that paid area standard wages and benefits. We are barred by section 10(e) of the Act, 29 U.S.C. § 160(e) (1982), from considering whether the Board erred in so holding because Local 705 did not raise this objection before the Board. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665, 102 S.Ct. 2071, 2082, 72 L.Ed.2d 398 (1982) .

tunes of non-bargaining unit employees. *See Local 644*, 533 F.2d at 1145 ("secondary subcontracting clauses ... do not seek only 'to protect and preserve the work and standards [the union] has bargained for,' but instead 'extend beyond the [contracting] employer and are aimed really at the union's differences with another employer.'"); *Plumbers and Steamfitters Local 342 v. NLRB*, 598 F.2d 216, 219 (D.C.Cir. 1979) (not all union standards clauses are secondary). The law of section 8(e) is too subtle and complex, however, for us to speculate as to how the Board will resolve these issues. *See, e.g., National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 620, 638, 87 S.Ct. 1250, 1255, 1265, 18 L.Ed.2d 357 (1967); *NLRB v. Enterprise Ass'n*, 429 U.S. 507, 517, 97 S.Ct. 891, 897, 51 L.Ed.2d 1 (1977); *NLRB v. International Longshoremen's Ass'n*, 447 U.S. 490, 504, 100 S.Ct. 2305, 2313, 65 L.Ed.2d 289 (1980). We cannot know, for instance, whether the Board would focus on the agreement's purpose when signed or when the union first asserted the disputed interpretation, nor whether the agreement (as interpreted by the grievance board) could have been designed to preserve bargaining unit work—by, for example, creating an economic disincentive to excessive subcontracting that might encroach on the airport transfer drivers' bargaining unit work. *See id.* at 507, 100 S.Ct. at 2315 (focus of work preservation dispute is unit's traditional work, not work of other employees incidentally affected by agreement).

We only insist that the Board explicitly deal with petitioner's primary argument that by filing a grievance it was merely seeking enforcement of a lawful provision of its collective bargaining agreement with Emery, and therefore, we remand to the Board for further explanation.

*Affirmed in part, and remanded in part.*