**THE OHIO VALLEY COAL COMPANY, Powhatan No. 6 Mine, Plaintiff–Appellant,**

v.

**PLEASANT RIDGE SYNFUELS, L.L.C., Plaintiff–Intervenor–Appellant,**

v.

**United Mine Workers of America, International Union, District 6, Local 1810 Defendant–Appellee.**

**Nos. 01–3455, 01–3456.**

United States Court of Appeals, Sixth Circuit.

Dec. 23, 2002.

Before BOGGS and COLE, Circuit Judges; and BATTANI,\* District Judge.

OPINION

COLE, J.

This action arises out of a grievance filed by the United Mine Workers of America ("UMWA"), charging that a coal mining company, The Ohio Valley Coal Company ("Ohio Valley"), wrongly assigned jobs in a synthetic fuel facility to non-union employees. This grievance resulted in an arbitration proceeding and eventually a ruling in favor of the UMWA. Ohio Valley and the owner of the synthetic fuel facility, Pleasant Ridge Synfuels, L.L.C. ("Pleasant Ridge"), sought judicial

\* The Honorable Marianne O. Battani, United States District Judge for the Eastern District of Michigan, sitting by designation.

review to vacate the arbitration award. The district court granted summary judgment to the UMWA, and Ohio Valley and Pleasant Ridge appeal from that judgment.

This appeal presents two issues for our review: (1) whether the district court properly granted the UMWA's motion for summary judgment on the ground that the arbitrator's award draws its essence from the Collective Bargaining Agreement ("CBA"); and (2) whether the district court properly granted the UMWA's motion for summary judgment on the ground that the arbitrator's award does not violate the National Labor Relations Act ("NLRA") or public policy. For the following reasons, we AFFIRM the judgment of the district court.

## I. BACKGROUND

### A. Factual Background

Ohio Valley owns and operates Powhatan No. 6 Mine in Belmont County, Ohio. Ohio Valley also owns numerous acres of land above ground ("Mine Property") upon which a coal-processing facility is situated. Workers from the UMWA, Local 1810, are employed both to extract bituminous coal from the mine and to operate the coal-processing facility. Ohio Valley signed the CBA with the UMWA in 1993, and that agreement determines the wage and other terms and conditions of employment of UMWA employees.

Pleasant Ridge is a Delaware limited liability company formed in 1998 solely for the purpose of taking advantage of federal tax credits for producing fuel from nonconventional sources. 26 U.S.C. § 29 (2002). Pleasant Ridge has a patented binding ma-

terial to convert coal particles recovered from the Powhatan slurry pond[1] into synthetic fuel pellets.

On April 15, 1998, four separate agreements were entered into among Ohio Valley and various partners involved in the construction and operation of the synthetic fuels plant (the "Synfuels Facility"). First, under the guidance of its chief executive officer, Robert Murray, Ohio Valley leased approximately 5.9 acres of its Mine Property to Pleasant Ridge in order for Pleasant Ridge to construct and operate the Synfuels Facility. A Surface Property Lease gave Pleasant Ridge the exclusive right to use technology it had acquired and to construct its Synfuels Facility on the Mine Property, and to recover, process, and sell the waste materials from the Powhatan slurry pond. Second, Pleasant Ridge entered into a Coal Fines Supply Agreement with Ohio Valley under which Pleasant Ridge agreed to purchase, and recover, process fine pieces of coal, also referred to as "coal fines," deposited into the slurry pond as a result of the coal preparation process. Next, though Pleasant Ridge owned the rights to the technology necessary to convert the waste product from the slurry pond into synthetic fuel, it had no experience in operating such a facility. Therefore, it entered into an Operations and Maintenance Agreement with Pennsylvania Transloading, Inc., a company owned by Robert Murray. PT acquired the rights to operate and maintain the facility, and the Operations and Maintenance Agreement detailed the pay rates, benefits, and job responsibilities for the Synfuels Facility. Pleasant Ridge also

---

1. A slurry pond results from the coal preparation process in which coal is separated, crushed, washed and then dried. In the process, fine coal is mixed with the wash water and a black, water-based mixture is formed. This mixture is disposed of as a waste product

in an environmentally approved slurry pond. In the present case, the Powhatan slurry pond is located on roughly 100 acres of the Mine Property and is the source of the fine coal materials for the Synfuels Facility.

entered into a Fuel Service Agreement with the American Coal Sales Company, another company owned by Robert Murray. Under this agreement, American Coal Sales would purchase the coal-based synthetic fuel pellets produced at the Synfuels Facility that would be deposited into Ohio Valley's coal stock and both products would be sold to customers. Finally, on May 14, 1998, Robert Murray, on behalf of PT, assigned all rights under the Operations and Maintenance Agreement to CQ Energy Partners LTD ("CQ"). CQ has the right to operate and maintain the Synfuels Facility and it currently operates the facility.

### B. Procedural History

On June 17, 1998, the UMWA filed a grievance against Ohio Valley, arguing that the assignment of the rights at the Synfuels Facility to CQ violated the CBA. The grievance was assigned to Arbitrator John S. West (the "Arbitrator"), who ultimately decided in favor of the UMWA on April 12, 1999. However, even though the Arbitrator sustained the UMWA's grievance, he found that he had no authority to bind Pennsylvania Transloading, Inc., an affiliate of Ohio Valley and the assignor of the operation and maintenance rights, because it was not a signatory to the CBA. The Arbitrator awarded only limited damages since the UMWA could not establish that a laid-off classified employee should have been hired at the facility, and retained jurisdiction with regard to any potential damages to be paid. Ohio Valley and Pleasant Ridge filed separate complaints against the UMWA in the United States District Court for the Southern District of Ohio on April 30, 1999, seeking to vacate the arbitration award. Pleasant Ridge filed a motion for summary judgment on August 16, 2000, the UMWA filed a motion for summary judgment on August 17, 2000, and Ohio Valley filed a

motion for summary judgment on August 18, 2000. The district court entered its Opinion and Order on March 26, 2001, granting the UMWA's motion for summary judgment, denying the motions by Pleasant Ridge and Ohio Valley, and dismissing their cases with prejudice. Pleasant Ridge filed a timely notice of appeal on April 23, 2001, and Ohio Valley filed a timely notice of appeal on April 24, 2001.

### II. STANDARD OF REVIEW

An appellate court reviews a district court's confirmation of an arbitration award "for clear error on findings of fact and de novo on questions of law." *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir.2000). We review an arbitrator's decision on an extremely narrow basis. *Lattimer–Stevens Co. v. United Steelworkers of Am.*, 913 F.2d 1166, 1169 (6th Cir.1990). This is true even where the decision misinterprets the parties' agreement and involves "improvident, even silly, fact-finding." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001). Even serious error by an arbitrator is not adequate to overturn a decision where the award was arguably construing or applying the contract, and the arbitrator was acting within the scope of his authority. *United Paperworkers Int'l Union v. Misco. Inc.*, 484 U.S. 29, 37–38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). We take a very limited review of the record and we defer to the arbitrator for interpretation of the agreement unless either: (1) the arbitration award does not draw its essence from the CBA and the arbitrator applied his own "brand of industrial justice"; or (2) the award contravenes public policy. *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597–99, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Misco*, 484 U.S. at 38, 43, 108 S.Ct. 364.

## III. DISCUSSION

### A. The Collective Bargaining Agreement

This Court has explained that an arbitration award does not draw its essence from the CBA if it: (1) conflicts with the express terms of the agreement; (2) imposes additional requirements not expressly provided for in the agreement; (3) is without rational support or cannot be derived from the terms of the agreement; or (4) is based on general considerations of fairness and equity instead of the precise terms of the agreement. *Cement Divisions, Nat'l Gypsum Co. v. United Steelworkers of Am.*, 793 F.2d 759, 766 (6th Cir.1986). Ohio Valley and Pleasant Ridge jointly argue that a number of factors indicate that the Arbitrator's award meets the requirements of *Cement Divs.* and does not draw its essence from the CBA.

Primarily they contend that several of the Arbitrator's decisions directly conflict with the express terms of Article IA, Section (f). of the CBA. That section states in relevant part:

> [T]he Employers agree that this Agreement covers the operation of all the coal lands, coal producing and coal preparation facilities owned or held under lease by ... any subsidiary or affiliate at the date of this Agreement, or acquired during its term which may hereafter (during the term of this Agreement) be put into production or use. This section will immediately apply to any new operations upon the Union's recognition, certification, or otherwise properly obtaining bargaining rights.

The Arbitrator concluded that the Synfuels Facility is covered under Section (f) because: (1) the facility qualifies as a coal preparation facility; (2) Pennsylvania Transloading, Inc. is an affiliate of Ohio Valley; and (3) Pennsylvania Transloading. Inc. holds the right to operate the

facility, even though Pleasant Ridge holds title to it. Therefore, pursuant to the CBA, Pennsylvania Transloading, Inc., as an affiliate of Ohio Valley, was required to offer the jobs at issue here to UMWA employees.

Ohio Valley and Pleasant Ridge take issue with three of the Arbitrator's findings. But under our narrow standard of review of arbitration awards, we cannot overturn these findings. First, as the district court aptly noted, the term "coal preparation facilities" is not defined in the CBA. Accordingly, we must accept the Arbitrator's interpretation of ambiguous contract terms, such as this one. even if we find such interpretation erroneous. *Misco*, 484 U.S. at 38, 108 S.Ct. 364 ("the parties having authorized the arbitrator to give meaning the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.") (citation omitted).

Ohio Valley and Pleasant Ridge also contest the Arbitrator's factual finding that Pennsylvania Transloading, Inc. is an affiliate of Ohio Valley. The Arbitrator based that finding on evidence that "Robert Murray apparently runs or has a controlling interest in both [Ohio Valley] and [Pennsylvania Transloading, Inc.]." He then reasoned that the fact that Robert Murray was the chief executive officer of Ohio Valley and owned and controlled Pennsylvania Transloading, Inc., led him to conclude that Pennsylvania Transloading. Inc. was an affiliate under the CBA. Again, because we are not to undertake an independent interpretation of the evidence reviewed by the Arbitrator, we leave his determination of fact undisturbed.

Third. Ohio Valley and Pleasant Ridge challenge the Arbitrator's finding that Pennsylvania Transloading, Inc. held the right to operate the facility. In particular, Ohio Valley argues that the Operations

and Maintenance Agreement between Pleasant Ridge and Pennsylvania Transloading does not implicate the CBA because Pennsylvania Transloading was hired by Pleasant Ridge as a contractor/licensee to operate, maintain, and repair the facility; Pleasant Ridge argues that there was no lease agreement or production contract between Pleasant Ridge and Pennsylvania Transloading because the contractual agreement structured to qualify for federal tax credits under § 29 precludes the Arbitrator's finding of a lease agreement or production contract. We reject both arguments. The Arbitrator concluded that, despite the lack of evidence presented at the hearing, the arrangement between Pleasant Ridge and Pennsylvania Transloading must have included some type of lease agreement or production contract that was subsequently assigned to CQ. The original Operations and Maintenance Agreement transferred the right to operate and maintain the facility from Pleasant Ridge to Pennsylvania Transloading. Though the Arbitrator never referred to the Operations and Maintenance Agreement specifically in his award, all parties acknowledge its existence and agree that it assigns the exclusive right to operate the facility and to produce the synthetic fuel product. Therefore, the Arbitrator's finding that a lease existed between the parties is supported sufficiently by the evidence.

After making these three preliminary findings of fact, the Arbitrator then determined that Pennsylvania Transloading as an affiliate of Ohio Valley, was required under the CBA to staff the synthetic fuel facility with union (UMWA) rather than non-union (CQ) employees. The district court surmised that the Arbitrator reached this conclusion by interpreting Section (f) such that the term "held under lease" modifies "operation" rather than "facilities." Again, like the district court, we find

that the Arbitrator's interpretation of the CBA is sufficiently plausible to withstand our review. *General Truck Drivers, Chauffeurs, Warehousemen & Helpers, Local No. 957 v. Dayton Newspapers, Inc.,* 190 F.3d 434, 438 (6th Cir.1999)("[w]hether the arbitrator's reading of the agreement was strained or even seriously flawed ... is irrelevant."). In particular, Pleasant Ridge divided its rights of ownership and operation in the facility and transferred the separate right to operate the facility to Pennsylvania Transloading through the Operations and Maintenance Agreement.

Finally, we reject Ohio Valley's contention that the Arbitrator improperly based his decision on considerations of fairness and equity. Taking the Arbitrator's conclusion that Pennsylvania Transloading "could have put the plant into production" using union employees rather than non-labor employees, Ohio Valley surmises that this indicates that the Arbitrator was acting on his own sense of fair play rather than what was required by the CBA. We disagree. There simply is no evidence that the Arbitrator has imposed his own brand of industrial justice by concluding that the work performed at the Synfuels Facility is not significantly similar from the work at Ohio Valley's coal processing plant. *See Beacon Journal Publ'g Co. v. Akron Newspaper Guild, Local Number 7,* 114 F.3d 596, 600 (6th Cir.1997).

Accordingly, we reject the challenges made to the factual determinations of the Arbitrator and his interpretation of the CBA. We conclude that the district court properly granted the UMWA's motion for summary judgment on the ground that the Arbitrator's award draws its essence from the CBA.

**B. Violation of the National Labor Relations Act and public policy**

To begin, a court's authority to vacate an arbitration award as a violation

of public policy is extremely narrow. *DBM Tech., Inc. v. Local 227, United Food and Commercial Workers Int'l Union*, 257 F.3d 651, 659 (6th Cir.2001). The Supreme Court has explained that an arbitration award violates public policy when it "would violate 'some explicit public policy' that is 'well-defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from the general considerations of supposed public interests.'" *Misco*, 484 U.S. at 43, 108 S.Ct. 364(citation omitted). Ohio Valley and Pleasant Ridge claim that the Arbitrator's award contravenes public policy because it violates Section 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4)(B) and (e) (2002). In particular, they argue that the award prevents them from doing business with other companies by giving the UMWA the right to jobs at the Synfuels Facility that they do not traditionally perform. This, appellants assert, represents an attempt by UMWA to acquire new jobs in direct contravention of federal statutory law preventing union agreements designed to monopolize jobs not traditionally preformed by union employees. But a review of the factual determinations made by the Arbitrator support the district court's finding that the award does not violate the NLRA or public policy as the award sought to preserve work for the UMWA in accordance with the CBA.

The district court based its conclusion on an analysis of relevant Supreme Court precedent. The court began with the established notion that work agreements "tactically calculated to satisfy union objectives elsewhere" through the incorporation of secondary activities are clearly prohibited under 29 U.S.C. § 158(b)(4)(B) and (e) of the NLRA. *See National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 635–39, 87 S.Ct. 1250, 18 L.Ed.2d 357(1967). In contrast, those that involve only primary activities and are intended to preserve jobs but have "[i]ncidental secondary effects" are allowed under § 158(b)(4)(B) and (e). *See Nat'l Mar. Union of Am. v. Commerce Tankers Corp.*, 457 F.2d 1127, 1137 (2d Cir.1971). *See also Nat'l Labor Relations Bd. v. Int'l Longshoremen's Ass'n*, 447 U.S. 490, 507, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980)("ILA I"). In evaluating whether an agreement satisfies the work preservation doctrine a court must examine only two factors: (1) whether the employer has the right to control the assignment of the work at issue; and (2) whether the work is that traditionally performed by the union. *See ILA I*, 447 U.S. at 504, 100 S.Ct. 2305. The district court considered the claims of Ohio Valley and Pleasant Ridge through this framework and correctly determined that the arbitration award did not violate the NLRA or public policy.

### 1. The right-to-control test

The right-to-control test is primarily "an exercise in factfinding," *Misco*, 484 U.S. at 44, 108 S.Ct. 364, and the district court properly ceded this factfinding role to the Arbitrator. He found that Ohio Valley did have control over the assignment of work at the Synfuels Facility because Murray owned a controlling interest in Pennsylvania Transloading. Parties who bargain for the facts to be found by an arbitrator familiar with the plant should not rely on judicial review of an arbitrator's decision to re-evaluate findings of fact even where improvident or erroneous. *See Garvey*, 532 U.S. at 509, 121 S.Ct. 1724. Therefore. we decline to re-evaluate the factual determination of the Arbitrator regarding the right of Ohio Valley to control the assignment of work at the Synfuels Facility and we hold that the arbitration award satisfies the first test of *ILA I*.

### 2. The traditional work test

The second test in deciding whether the award satisfies the work preservation doctrine looks to whether the work in question is traditionally performed by the UMWA. The work at issue needs to be either that which has been historically performed by union employees or that which is "fairly claimable" by employees because it requires skills and abilities similar to those of the traditional work performed. *ILA I*, 477 U.S. at 504, 100 S.Ct. 2305; *Frito-Lay, Inc. v. Retail Clerks*, 629 F.2d 653, 660 (10th Cir.1980). The key issue for consideration by the Arbitrator in this case was whether work at the Synfuels Facility is similar enough to that already performed by the UMWA at the coal-processing facility on the Mine Property. After touring the facility and conducting a hearing, the Arbitrator concluded that the work at both facilities was sufficiently similar. He concluded that although the Synfuels Facility used a patented chemical in its process, both facilities involved the processing of coal and their end products were sold through traditional coal-marketing channels. This factual finding led the Arbitrator to determine that the work at the Synfuels Facility is "fairly claimable" as similar enough to work being performed at the coal processing plant. Thus, work at the Synfuels Facility was covered under the CBA, in that it was the kind traditionally performed by the UMWA.

In further support of his conclusion that the CBA supports work preservation rather than work acquisition, the Arbitrator cited Article II, Section (f), of the CBA. This section establishes the "UMWA–Employer Skills Training Program" which requires Ohio Valley to develop a training program designed to help union workers preserve their jobs in the coal industry. Under this program, Ohio Valley is required to assist union workers in updating their current skills and acquiring new skills in order to keep pace with technological changes in the industry. The Arbitrator found that Ohio Valley violated this provision of the CBA because it was obligated to provide training to the classified employees in order for them to work with the new technology in the Synfuels Facility These factual determinations by the Arbitrator are within the scope of his authority. We therefore conclude that his award is consistent with the work preservation doctrine.

### IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.